

# ASTA FUNDING INC

# FORM 10-Q
### (Quarterly Report)

## Filed 08/10/15 for the Period Ending 06/30/15

| | |
|---|---|
| Address | 210 SYLVAN AVE |
| | ENGLEWOOD CLIFFS, NJ 07632 |
| Telephone | 2015675648 |
| CIK | 0001001258 |
| Symbol | ASFI |
| SIC Code | 6153 - Short-Term Business Credit Institutions, Except Agricultural |
| Industry | Consumer Financial Services |
| Sector | Financial |
| Fiscal Year | 09/30 |



http://www.edgar-online.com
© Copyright 2015, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

---

# FORM 10-Q

---

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended June 30, 2015**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____to _____**

**Commission file number: 001-35637**

---

# ASTA FUNDING, INC.
### (Exact name of registrant as specified in its charter)

---

| | |
|---|---|
| **Delaware** | **22-3388607** |
| **(State or other jurisdiction** | **(IRS Employer** |
| **of incorporation or organization)** | **Identification No.)** |
| **210 Sylvan Ave., Englewood Cliffs, New Jersey** | **07632** |
| **(Address of principal executive offices)** | **(Zip Code)** |

### Registrant's telephone number: (201) 567-5648

---

Former name, former address and former fiscal year, if changed since last report: N/A

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☒ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).    Yes ☐    No ☒

As of August 7, 2015, the registrant had 13,060,839 common shares outstanding.

# ASTA FUNDING, INC.
# INDEX TO FORM 10-Q

Part I. Financial Information   3

Item 1. Condensed Consolidated Financial Statements   3

  Condensed Consolidated Balance Sheets as of June 30, 2015 and September 30, 2014 (unaudited)   3

  Condensed Consolidated Statements of Income for the three and nine month periods ended June 30, 2015 and 2014 (unaudited)   4

  Condensed Consolidated Statements of Comprehensive (Loss) Income for the three and nine month periods ended June 30, 2015 and 2014 (unaudited)   5

  Condensed Consolidated Statement of Stockholders' Equity for the nine month periods ending June 30, 2015 and 2014 (unaudited)   6

  Condensed Consolidated Statements of Cash Flows for the nine month periods ended June 30, 2015 and 2014 (unaudited)   7

  Notes to Condensed Consolidated Financial Statements (unaudited)   8

Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations   32

Item 3. Quantitative and Qualitative Disclosures about Market Risk   46

Item 4. Controls and Procedures   47

Part II. Other Information   47

Item 1. Legal Proceedings   47

Item 1A. Risk Factors   48

Item 2 Unregistered Sales of Equity Securities and Use of Proceeds   48

Item 3. Defaults Upon Senior Securities   48

Item 4. Mine Safety Disclosures   48

Item 5. Other Information   48

Item 6. Exhibits   48

Signatures   48

  Exhibit 31.1
  Exhibit 31.2
  Exhibit 32.1
  Exhibit 32.2

**PART I. FINANCIAL INFORMATION**

**Item 1. Financial Statements**

**ASTA FUNDING, INC. AND SUBSIDIARIES**
**Condensed Consolidated Balance Sheets**
**(Unaudited)**

| | June 30, 2015 | September 30, 2014 |
|---|---|---|
| **ASSETS** | | |
| Cash and cash equivalents | $ 27,647,000 | $ 28,710,000 |
| Available for sale investments | 69,686,000 | 66,799,000 |
| Consumer receivables acquired for liquidation (at net realizable value) | 18,884,000 | 29,444,000 |
| Structured settlements, (at fair value) | 56,567,000 | 42,079,000 |
| Investment in personal injury claims | 37,155,000 | 32,352,000 |
| Other investments | 4,412,000 | — |
| Due from third party collection agencies and attorneys | 988,000 | 1,026,000 |
| Prepaid and income taxes receivable | — | 430,000 |
| Furniture and equipment, net | 435,000 | 756,000 |
| Deferred income taxes | 7,511,000 | 6,786,000 |
| Goodwill | 2,770,000 | 2,770,000 |
| Other assets | 7,667,000 | 5,986,000 |
| Total assets | $233,722,000 | $217,138,000 |
| **LIABILITIES** | | |
| Other debt – CBC (including non-recourse notes payable amounting to $32.3 million at June 30, 2015 and $12.7 million at September 30, 2014) | $ 46,704,000 | $ 32,295,000 |
| Income taxes payable | 523,000 | — |
| Other liabilities | 3,959,000 | 3,587,000 |
| Total liabilities | 51,186,000 | 35,882,000 |
| Commitments and contingencies | | |
| **STOCKHOLDERS' EQUITY** | | |
| Preferred stock, $.01 par value; authorized 5,000,000 shares; issued and outstanding — none | — | — |
| Common stock, $.01 par value; authorized 30,000,000 shares; issued and outstanding — 13,060,839 at June 30, 2015 and 12,985,839 at September 30, 2014. | 130,000 | 130,000 |
| Additional paid-in capital | 64,707,000 | 63,102,000 |
| Retained earnings | 119,471,000 | 118,595,000 |
| Accumulated other comprehensive (loss) income | (498,000) | 142,000 |
| Non-controlling interests | (1,274,000) | (713,000) |
| Total stockholders' equity | 182,536,000 | 181,256,000 |
| Total liabilities and stockholders' equity | $233,722,000 | $217,138,000 |

See Notes to Condensed Consolidated Financial Statements

3

**ASTA FUNDING, INC. AND SUBSIDIARIES**
**Condensed Consolidated Statements of Income**
**(Unaudited)**

| | Three Months Ended June 30, 2015 | Three Months Ended June 30, 2014 | Nine Months Ended June 30, 2015 | Nine Months Ended June 30, 2014 |
|---|---|---|---|---|
| Revenues: | | | | |
| Finance income on consumer receivables, net | $ 5,156,000 | $ 5,074,000 | $15,688,000 | $14,792,000 |
| Personal injury claims income | 1,729,000 | 1,779,000 | 6,084,000 | 5,724,000 |
| Unrealized gain on structured settlements | 1,239,000 | 620,000 | 4,260,000 | 1,440,000 |
| Interest income on structured settlements | 1,356,000 | 786,000 | 3,314,000 | 1,501,000 |
| Disability fee income | 552,000 | 137,000 | 911,000 | 253,000 |
| Total revenues | 10,032,000 | 8,396,000 | 30,257,000 | 23,710,000 |
| Forgiveness of non-recourse debt | — | 26,101,000 | — | 26,101,000 |
| Other income (includes ($159,000) and ($116,000) during the three month periods ended June 30, 2015 and 2014, respectively, and ($120,000) and ( $141,000) during the nine month periods ended June 30, 2015 and 2014, respectively, of accumulated other comprehensive income reclassification for unrealized net gains / (losses) on available for sale securities) | 185,000 | 199,000 | 1,216,000 | 1,117,000 |
| | 10,217,000 | 34,696,000 | 31,473,000 | 50,928,000 |
| Expenses: | | | | |
| General and administrative | 9,177,000 | 7,012,000 | 27,793,000 | 20,517,000 |
| Interest | 632,000 | 413,000 | 1,710,000 | 820,000 |
| Impairments of consumer receivables acquired for liquidation | — | 19,591,000 | — | 19,591,000 |
| | 9,809,000 | 27,016,000 | 29,503,000 | 40,928,000 |
| Income before income tax | 408,000 | 7,680,000 | 1,970,000 | 10,000,000 |
| Income tax expense (includes tax benefit of ($64,000) and ($47,000), respectively, during the three month periods ended June 30, 2015 and 2014, and ($27,000) and ($57,000) during the nine month periods ended June 30, 2015 and 2014, respectively, of accumulated other comprehensive income reclassifications for unrealized net gains / (losses) on available for sale securities) | 155,000 | 2,973,000 | 901,000 | 3,808,000 |
| Net income | 253,000 | 4,707,000 | 1,069,000 | 6,192,000 |
| Less: net income attributable to non-controlling interests | 92,000 | 20,000 | 193,000 | 483,000 |
| Net income attributable to Asta Funding, Inc. | $ 161,000 | $ 4,687,000 | $ 876,000 | $ 5,709,000 |
| Net income per share attributable to Asta Funding, Inc.: | | | | |
| Basic | $ 0.01 | $ 0.36 | $ 0.07 | $ 0.44 |
| Diluted | $ 0.01 | $ 0.35 | $ 0.07 | $ 0.43 |
| Weighted average number of common shares outstanding: | | | | |
| Basic | 13,060,839 | 12,984,882 | 13,044,905 | 12,979,472 |
| Diluted | 13,313,406 | 13,214,703 | 13,311,776 | 13,208,015 |

See Notes to Condensed Consolidated Financial Statements

4

**ASTA FUNDING, INC.**
**Condensed Consolidated Statements of Comprehensive (Loss) Income**
**(Unaudited)**

| | Three Months Ended June 30, 2015 | Three Months Ended June 30, 2014 | Nine Months Ended June 30, 2015 | Nine Months Ended June 30, 2014 |
|---|---|---|---|---|
| Comprehensive (loss) income is as follows: | | | | |
| Net income | $ 253,000 | $ 4,707,000 | $ 1,069,000 | $ 6,192,000 |
| Net unrealized securities (loss) / gain , net of tax (benefit) / expense of ($61,000) and $263,000, during the 3 month periods ended June 30, 2015 and 2014, respectively, and ($213,000) and $511,000 during the 9 month periods ended June 30, 2015 and 2014, respectively. | (310,000) | 394,000 | (547,000) | 780,000 |
| Reclassification adjustments for securities sold, net of tax benefit of ($36,000) and ($47,000), respectively, during the 3 month periods ended June 30, 2015 and 2014, and ($27,000) and ($57,000), during the 9 month periods ended June 30, 2015 and 2014, respectively. | (123,000 ) | (69,000) | (93,000) | (84,000) |
| Other comprehensive (loss) income | (433,000) | 325,000 | (640,000) | 696,000 |
| Total comprehensive (loss) income | $ (180,000) | $ 5,032,000 | $ 429,000 | $ 6,888,000 |

See Notes to Condensed Consolidated Financial Statements

5

**ASTA FUNDING, INC. AND SUBSIDIARIES**
**Condensed Consolidated Statement of Stockholders' Equity**
**(Unaudited)**

| | Common Stock | | Additional Paid-in Capital | Retained Earnings | Accumulated Other Comprehensive Income (loss) | Non-Controlling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | |
| **Balance, September 30, 2014** | 12,985,839 | $130,000 | $63,102,000 | $118,595,000 | $ 142,000 | $ (713,000) | $ 181,256,000 |
| Exercise of options | 60,000 | — | 469,000 | — | — | — | 469,000 |
| Stock based compensation expense | — | — | 1,136,000 | — | — | — | 1,136,000 |
| Restricted stock | 15,000 | — | — | — | — | — | — |
| Net income | — | — | — | 876,000 | — | 193,000 | 1,069,000 |
| Unrealized loss on marketable securities | — | — | — | — | (640,000) | — | (640,000) |
| Distributions to non-controlling interest | — | — | — | — | — | (754,000) | (754,000) |
| **Balance, June 30, 2015** | 13,060,839 | $130,000 | $64,707,000 | $119,471,000 | $ (498,000) | $(1,274,000) | $ 182,536,000 |

| | Common Stock | | Additional Paid-in Capital | Retained Earnings | Accumulated Other Comprehensive Loss | Treasury Stock [1] | Non-Controlling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | | |
| **Balance, September 30, 2013** | 14,917,977 | $149,000 | $ 79,104,000 | $112,694,000 | $ (674,000) | ($17,805,000) | $ (184,000) | $ 173,284,000 |
| Exercise of options | 11,500 | — | 40,000 | — | — | — | — | 40,000 |
| Stock based compensation expense | — | — | 1,290,000 | — | — | — | — | 1,290,000 |
| Net income | — | — | — | 5,709,000 | — | — | 483,000 | 6,192,000 |
| Unrealized gain on marketable securities | — | — | — | — | 696,000 | — | — | 696,000 |
| Retirement of treasury stock | (1,943,738) | (19,000) | (17,786,000) | — | — | 17,805,000 | — | — |
| Distributions to non-controlling interest | — | — | — | — | — | — | (837,000) | (837,000) |
| **Balance, June 30, 2014** | 12,985,739 | $130,000 | $ 62,648,000 | $118,403,000 | $ 22,000 | $ — | $ (538,000) | $ 180,665,000 |

(1)     Treasury shares at September 30, 2013 totaled 1,923,738.

See Notes to Condensed Consolidated Financial Statements

6

**ASTA FUNDING, INC. AND SUBSIDIARIES**
**Condensed Consolidated Statements of Cash Flows**
**(Unaudited)**

| | Nine Months Ended June 30, 2015 | Nine Months Ended June 30, 2014 |
|---|---:|---:|
| **Cash flows from operating activities** | | |
| Net income | $ 1,069,000 | $ 6,192,000 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation and amortization | 459,000 | 450,000 |
| Deferred income taxes | (485,000) | (773,000) |
| Impairment of consumer receivables acquired for liquidation | — | 19,591,000 |
| Stock based compensation | 1,136,000 | 1,290,000 |
| Loss on sale of available-for-sale securities | 120,000 | 141,000 |
| Structured settlements - accrued interest | (3,055,000) | (1,475,000) |
| Structured settlements – gains | (4,260,000) | (1,440,000) |
| Unrealized gain on other investments | (296,000) | — |
| Unrealized foreign exchange loss on other investments | 884,000 | — |
| Forgiveness of non-recourse debt | — | (26,101,000) |
| Changes in: | | |
| Prepaid and income taxes receivable | 430,000 | 1,496,000 |
| Due from third party collection agencies and attorneys | 38,000 | 31,000 |
| Other assets | (1,681,000) | (596,000) |
| Income taxes payable | 523,000 | 3,084,000 |
| Other liabilities | 372,000 | (119,000) |
| Net cash (used in) provided by operating activities | (4,746,000) | 1,771,000 |
| **Cash flows from investing activities** | | |
| Purchase of consumer receivables acquired for liquidation | (2,009,000) | (3,702,000) |
| Principal collected on receivables acquired for liquidation | 12,567,000 | 15,950,000 |
| Principal collected on receivables accounts represented by account sales | 2,000 | 1,000 |
| Purchase of available-for-sale securities | (17,564,000) | (19,845,000) |
| Proceeds from sale of available-for-sale securities | 13,677,000 | 8,684,000 |
| Purchase of other investments | (5,000,000) | — |
| Cash paid for acquisition (net of cash acquired) | — | (5,588,000) |
| Investments in personal injury claims – advances | (18,270,000) | (16,392,000) |
| Investments in personal injury claims – receipts | 13,467,000 | 20,417,000 |
| Investment in structured settlements – advances | (10,782,000) | (4,696,000) |
| Investments in structured settlements – receipts | 3,609,000 | 2,155,000 |
| Capital expenditures | (138,000) | |
| Net cash used in investing activities | (10,441,000) | (3,016,000) |
| **Cash flows from financing activities** | | |
| Proceeds from exercise of stock options | 469,000 | 40,000 |
| Changes in restricted cash | — | 968,000 |
| Distribution to non-controlling interest | (754,000) | (837,000) |
| Repayment of non-recourse debt | — | (9,659,000) |
| Borrowings of other debt | 33,923,000 | 4,131,000 |
| Repayments of other debt | (19,514,000) | (2,560,000) |
| Net cash provided by (used in) financing activities | 14,124,000 | (7,917,000) |
| **Net decrease in cash and cash equivalents** | (1,063,000) | (9,162,000) |
| Cash and cash equivalents at beginning of period | 28,710,000 | 35,179,000 |
| **Cash and cash equivalents at end of period** | $ 27,647,000 | $ 26,017,000 |
| **Supplemental disclosure of cash flow information :** | | |
| Cash paid for interest | $ 1,736,000 | $ 678,000 |
| **Supplemental disclosures of non-cash investing and financing activities:** | | |
| Structured settlements | $ — | $ 30,436,000 |
| Other debt – CBC | — | 23,363,000 |
| Retirement of treasury stock | — | 17,805,000 |

See Notes to Condensed Consolidated Financial Statements

**ASTA FUNDING, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**Note 1—Business and Basis of Presentation**

*Business*

Asta Funding, Inc., together with its wholly-owned significant operating subsidiaries Palisades Collection LLC, Palisades Acquisition XVI, LLC ("Palisades XVI"), VATIV Recovery Solutions LLC ("VATIV"), ASFI Pegasus Holdings, LLC ("APH"), Fund Pegasus, LLC ("Fund Pegasus"), GAR Disability Advocates, LLC ("GAR Disability Advocates") and other subsidiaries, not all wholly owned (collectively, the "Company"), has been engaged in the business of purchasing, managing for its own account and servicing distressed consumer receivables, including charged-off receivables, and semi-performing receivables, since 1994, as well as more recent business segments, discussed below. The primary charged-off receivables are accounts that have been written-off by the originators and may have been previously serviced by collection agencies. Semi-performing receivables are accounts where the debtor is currently making partial or irregular monthly payments, but the accounts may have been written-off by the originators. Distressed consumer receivables are the unpaid debts of individuals to banks, finance companies and other credit providers. A large portion of the Company's distressed consumer receivables are MasterCard ® , Visa ® , other credit card accounts, and telecommunication accounts which were charged-off by the issuers for non-payment. The Company acquires these portfolios at substantial discounts from their face values. The discounts are based on the characteristics (issuer, account size, debtor residence and age of debt) of the underlying accounts of each portfolio. Litigation related receivables are semi-performing investments whereby the Company is assigned the revenue stream from the proceeds received.

The Company owns 80% of Pegasus Funding, LLC ("Pegasus"), which invests in funding personal injury claims and 80% of CBC Settlement Funding, LLC ("CBC"), which invests in structured settlements.

Pegasus provides funding for individuals in need of short term funds pending insurance settlements of their personal injury claims. The funds will be recouped when the underlying insurance settlements are paid. The long periods of time taken by insurance companies to settle and pay such claims resulting from lengthy litigation and the court process is fueling the demand for such funding.

CBC provides liquidity to consumers by purchasing certain deferred payment streams including, but not limited to, structured settlements and annuities. CBC generates business from direct marketing as well as through wholesale purchases from brokers or other third parties. CBC has its principal office in Conshohocken, Pennsylvania. CBC primarily warehouses the receivables it originates and periodically resells or securitizes those assets on a pooled basis. The structured settlement marketplace is regulated by federal and state law, requiring that each transaction is reviewed and approved by court order.

GAR Disability Advocates is a social security disability advocacy group, that represents individuals in their claims for social security disability and supplemental security income benefits from the Social Security Administration.

*Basis of Presentation*

The condensed consolidated balance sheet as of June 30, 2015, the condensed consolidated statements of income for the nine and three month periods ended June 30, 2015 and 2014, the condensed consolidated statements of comprehensive (loss) income for the nine and three month periods ended June 30, 2015 and 2014, the condensed consolidated statement of stockholders' equity as of and for the nine month periods ended June 30, 2015 and 2014, and the condensed consolidated statements of cash flows for the nine month periods ended June 30, 2015 and 2014, are unaudited. The September 30, 2014 financial information included in this report has been extracted from our audited financial statements included in our Annual Report on Form 10-K for the fiscal year ended September 30, 2014. In the opinion of management, all adjustments (which include only normal recurring adjustments) necessary to present fairly our financial position at June 30, 2015 and September 30, 2014, the results of operations for the nine and three month periods ended June 30, 2015 and 2014 and cash flows for the nine month periods ended June 30, 2015 and 2014 have been made. The results of operations for the nine and three month periods ended June 30, 2015 and 2014 are not necessarily indicative of the operating results for any other interim period or the full fiscal year.

Palisades XVI is a variable interest entity ("VIE"). Asta Funding, Inc. is considered the primary beneficiary because it has the power to direct the significant activities of the VIE via its ownership and service contract. Palisades XVI holds the Great Seneca portfolio, a $300 million portfolio purchase in March 2007 (the "Portfolio Purchase"), which, as of June 30, 2015, had a value of $12.5 million.

Blue Bell Receivables I, LLC, Blue Bells Receivables II, LLC Blue Bell Receivables III, LLC, Blue Bell Receivable IV (the "Blue Bell Entities") are VIEs. CBC is considered the primary beneficiary because it has the power to direct the significant activities of the VIEs via its ownership and service contract. It also has the rights to receive benefits from the collections that exceed the payments to the note holders. The Blue Bell Entities hold structured settlements of $56.6 million and the non-recourse notes payable of $32.3 million as of June 30, 2015.

**ASTA FUNDING, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**Note 1—Business and Basis of Presentation** *(continued)*

*Basis of Presentation* *(continued)*

The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with Rule 10-01 of Regulation S-X promulgated by the Securities and Exchange Commission and therefore do not include all information and note disclosures required under generally accepted accounting principles. The Company suggests that these financial statements be read in conjunction with the financial statements and notes thereto included in the Company's Annual Report on Form 10-K for the fiscal year ended September 30, 2014 filed with the Securities and Exchange Commission.

The Company applied SEC Staff Accounting Bulletin (SAB) No. 108, *Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements* and recorded an adjustment of $623,000 to the opening retained earnings for the quarter ended June 30, 2015 related to the cumulative impact of foreign exchange losses on the Topaz investment which is presented as Other Investments in these financial statements. Under SAB No. 108, correcting prior-period financial statements for "immaterial misstatements" does not require previously filed reports to be amended.

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates including management's estimates of future cash flows and the resulting rates of return.

*Concentration of Credit Risk – Cash*

The Company considers all highly liquid investments with a maturity date of three months or less at the date of purchase to be cash equivalents.

Cash balances are maintained at various depository institutions and are insured by the Federal Deposit Insurance Corporation ("FDIC"). At June 30, 2015, the Company had cash balances with 12 banks that exceeded the balance insured by the FDIC by approximately $22.0 million. The Company does not believe it is exposed to significant credit risk for cash.

**Recent Accounting Pronouncements**

In May 2014, the Financial Accounting Standards Board (the "FASB") issued an update to ASC 606, "Revenue from Contracts with Customers," that will supersede virtually all existing revenue guidance. Under this update, an entity is required to recognize revenue upon transfer of promised goods or services to customers, in an amount that reflects the entitled consideration received in exchange for those goods or services. The guidance also requires additional disclosure about the nature, amount, timing, and uncertainty of revenue and cash flows arising from the customer contracts. This update is effective for annual reporting periods beginning after December 15, 2016, including interim periods within that reporting period. Early application is not permitted. We are currently evaluating the impact this update will have on our consolidated financial statements as well as the expected adoption method.

In June 2014, the FASB issued ASU 2014-11, "Transfers and Servicing (Topic 860): Repurchase-to-Maturity Transactions, Repurchase Financings, and Disclosures." The amendments in this ASU require two accounting changes. First, the amendments in this ASU change the accounting for repurchase-to maturity transactions to secured borrowing accounting. Second, for repurchase financing arrangements, the amendments require separate accounting for a transfer of a financial asset executed contemporaneously with a repurchase agreement with the same counterparty, which will result in secured borrowing accounting for the repurchase agreement. This ASU also includes new disclosure requirements. The accounting changes in this Update are effective for public business entities for the first interim or annual period beginning after December 15, 2014. An entity is required to present changes in accounting for transactions outstanding on the effective date as a cumulative-effect adjustment to retained earnings as of the beginning of the period of adoption. Earlier application for a public business entity is prohibited. The Company reviewed this ASU and determined that it did not have a material impact on its consolidated financial statements.

In February 2015, the FASB issued ASU 2015-02, "Consolidation (Topic 810): Amendments to the Consolidation Analysis," which amends the consolidation requirements in ASC 810. This update is effective for public business entities for the first interim or annual period beginning after December 15, 2015. We are currently reviewing this ASU to determine if it will have an impact on our consolidated financial statements.

In May 2015, the FASB issued ASU 2015-07, "Fair Value Measurement (Topic 820): Disclosures for Investments in Certain Entities that Calculate Net Asset Value per Share (or Its Equivalent)". The amendments apply to reporting entities that elect to measure the fair value of an investment using the net asset value ("NAV") per share (or its equivalent) practical equivalent. The amendments remove the requirement to categorize within the fair value hierarchy all investments for which fair value is measured using the NAV per share practical expedient. The amendments in this ASU are effective for reporting periods beginning after December 15, 2015, with early adoption permitted. The Company has reviewed this ASU and has elected to early adopt these amendments in the quarter ending December 31, 2014 and has removed certain investments that are measured using the NAV practical expedient from the fair value hierarchy in all periods presented in the Company's consolidated financial statements.

**ASTA FUNDING, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**Note 2—Principles of Consolidation**

The condensed consolidated financial statements include the accounts of the Company and its wholly owned and majority owned subsidiaries. All significant intercompany balances and transactions have been eliminated in consolidation.

**Note 3—Available – for – Sale Investments**

*Available-for-Sale*

Investments classified as available-for-sale at June 30, 2015 and September 30, 2014, consist of the following:

|  | Amortized Cost | Unrealized Gains | Unrealized Losses | Fair Value |
|---|---|---|---|---|
| June 30, 2015 | $70,326,000 | $ 59,000 | $(699,000) | $69,686,000 |
| September 30, 2014 | $66,559,000 | $411,000 | $(171,000) | $66,799,000 |

The available-for-sale investments do not have any contractual maturities. The Company sold four investments during the first nine months of fiscal year 2015, with an aggregate realized loss of $120,000. During the first nine months of fiscal year 2015, the Company also received $234,000 in capital gain distributions. In the first nine months of fiscal year 2014, the Company sold two investments with an aggregate realized loss of $141,000. In the third quarter of fiscal year 2015, the Company sold one investment with a loss of $159,000. The company sold one investment during the three month period ended June 30, 2014, with a realized loss of $116,000.

At June 30, 2015, there were six investments, all of which were in an unrealized loss position. Four of these investments had current unrealized losses existing for 12 months or more. All of these securities are considered to be acceptable credit risks. Based on the evaluation of the available evidence, including recent changes in market rates and credit rating information, management believes the aggregate decline in fair value for these instruments is temporary. In addition, management has the ability to hold these investment securities for a period of time sufficient to allow for an anticipated recovery or maturity. Should the impairment of any of these securities become other than temporary, the cost basis of the investment will be reduced and the resulting loss recognized in net income in the period in which the other-than-temporary impairment is identified.

10

**ASTA FUNDING, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**Note 4—Consumer Receivables Acquired for Liquidation**

Accounts acquired for liquidation are stated at their net estimated realizable value and consist primarily of defaulted consumer loans to individuals primarily throughout the United States.

The Company may account for its investments in consumer receivable portfolios, using either:

- the interest method; or

- the cost recovery method.

The Company can account for certain of its investments in finance receivables using the interest method under the guidance of ASC 310-30. Under the guidance of ASC 310-30, static pools of accounts are established. These pools are aggregated based on certain common risk criteria. Each static pool is recorded at cost and is accounted for as a single unit for the recognition of income, principal payments and loss provision. Effective October 1, 2013, due to the substantial reduction of portfolios reported under the interest method, and the ability to reasonably estimate cash collections under the interest method, the Company concluded the cost recovery method is the appropriate accounting method under the circumstances.

Despite all of the Company's portfolios being on the cost recovery method, the Company must still analyze a portfolio upon acquisition and once a static pool is established for a quarter, individual accounts receivable were not added to the pool (unless replaced by the seller) or removed from the pool (unless sold or returned to the seller). ASC 310-30 requires that the excess of the contractual cash flows over expected cash flows not be recognized as an adjustment of revenue or expense or on the balance sheet. ASC 310-30 initially freezes the internal rate of return, referred to as IRR, estimated when the accounts receivable are purchased, as the basis for subsequent impairment testing. Significant increases in actual or expected future cash flows may be recognized prospectively through an upward adjustment of the IRR over a portfolio's remaining life. Any increase to the IRR then becomes the new benchmark for impairment testing. Rather than lowering the estimated IRR if the collection estimates are not received or projected to be received, the carrying value of a pool would be impaired, or written down to maintain the then current IRR. Under the interest method, income is recognized on the effective yield method based on the actual cash collected during a period and future estimated cash flows and timing of such collections and the portfolio's cost. Material variations of cash flow estimates are recorded in the quarter such variations are determined. The estimated future cash flows are reevaluated quarterly.

The Company uses the cost recovery method when collections on a particular pool of accounts cannot be reasonably predicted. Under the cost recovery method, no income is recognized until the cost of the portfolio has been fully recovered. A pool can become fully amortized (zero carrying balance on the balance sheet) while still generating cash collections. In this case, all cash collections are recognized as revenue when received.

The Company's extensive liquidating experience is in the field of distressed credit card receivables, telecommunication receivables, consumer loan receivables, retail installment contracts, consumer receivables, and auto deficiency receivables.

The Company may aggregate portfolios of receivables acquired sharing specific common characteristics which were acquired within a given quarter. The Company currently considers for aggregation portfolios of accounts, purchased within the same fiscal quarter, that generally meet the following characteristics:

- same issuer/originator;

- same underlying credit quality;

- similar geographic distribution of the accounts;

- similar age of the receivable; and

- same type of asset class (credit cards, telecommunication, etc.)

The Company uses a variety of qualitative and quantitative factors to estimate collections and the timing thereof. This analysis includes the following variables:

**ASTA FUNDING, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**Note 4—Consumer Receivables Acquired for Liquidation** *(continued)*

- the number of collection agencies previously attempting to collect the receivables in the portfolio;

- the average balance of the receivables, as higher balances might be more difficult to collect while low balances might not be cost effective to collect;

- the age of the receivables, as older receivables might be more difficult to collect or might be less cost effective. On the other hand, the passage of time, in certain circumstances, might result in higher collections due to changing life events of some individual debtors;

- past history of performance of similar assets;

- time since charge-off;

- payments made since charge-off;

- the credit originator and its credit guidelines;

- our ability to analyze accounts and resell accounts that meet our criteria for resale;

- the locations of the debtors, as there are better states to attempt to collect in and ultimately the Company has better predictability of the liquidations and the expected cash flows. Conversely, there are also states where the liquidation rates are not as favorable and that is factored into our cash flow analysis;

- financial condition of the seller;

- jobs or property of the debtors found within portfolios. In the Company's business model, this is of particular importance as debtors with jobs or property are more likely to repay their obligation and conversely, debtors without jobs or property are less likely to repay their obligation; and

- the ability to obtain timely customer statements from the original issuer.

The Company obtains and utilizes, as appropriate, input including, but not limited to, monthly collection projections and liquidation rates, from third party collection agencies and attorneys, as a further evidentiary matter, to assist in evaluating and developing collection strategies and in evaluating and modeling the expected cash flows for a given portfolio.

**ASTA FUNDING, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**Note 4—Consumer Receivables Acquired for Liquidation** *(continued)*

The following tables summarize the changes in the balance sheet account of consumer receivables acquired for liquidation during the following periods:

| | For the Nine Months Ended June 30, 2015 | | |
|---|---|---|---|
| | Interest Method | Cost Recovery Method | Total |
| Balance, beginning of period | $ | $ 29,444,000 | $ 29,444,000 |
| Acquisition of receivable portfolios | — | 2,009,000 | 2,009,000 |
| Net cash collections from collection of consumer receivables acquired for liquidation | — | (28,178,000) | (28,178,000) |
| Net cash collections represented by account sales of consumer receivables acquired for liquidation | — | (79,000) | (79,000) |
| Finance income recognized | — | 15,688,000 | 15,688,000 |
| Balance, end of period | $ — | $ 18,884,000 | $ 18,884,000 |
| Finance income as a percentage of collections | — % | 55.5% | 55.5% |

| | For the Nine Months Ended June 30, 2014 | | |
|---|---|---|---|
| | Interest Method | Cost Recovery Method | Total |
| Balance, beginning of period | $ 13,121,000 | 51,133,000 | 64,254,000 |
| Reclassification of interest method portfolios to cost recovery method | (13,121,000) | 13,121,000 | — |
| Acquisition of receivable portfolios | — | 3,702,000 | 3,702,000 |
| Net cash collections from collection of consumer receivables acquired for liquidation | — | (30,739,000) | (30,739,000) |
| Net cash collections represented by account sales of consumer receivables acquired for liquidation | — | (4,000) | (4,000) |
| Impairment | — | (19,591,000) | (19,591,000) |
| Finance income recognized (1) | — | 14,792,000 | 14,792,000 |
| Balance, end of period | $ — | $ 32,414,000 | $ 32,414,000 |
| Finance income as a percentage of collections | — % | 48.1% | 48.1% |

**ASTA FUNDING, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**Note 4—Consumer Receivables Acquired for Liquidation** *(continued)*

| | For the Three Months Ended June 30, 2015 | | |
| --- | --- | --- | --- |
| | Interest Method | Cost Recovery Method | Total |
| Balance, beginning of period | $ — | $ 22,178,000 | $ 22,178,000 |
| Acquisition of receivable portfolio | — | 388,000 | 388,000 |
| Net cash collections from collection of consumer receivables acquired for liquidation | — | (8,762,000) | (8,762,000) |
| Net cash collections represented by account sales of consumer receivables acquired for liquidation | — | (76,000 ) | (76,000) |
| Finance income recognized | — | 5,156,000 | 5,156,000 |
| Balance, end of period | $ — | $ 18,884,000 | $ 18,884,000 |
| Finance income as a percentage of collections | — % | 58.3% | 58.3% |

| | For the Three Months Ended June 30, 2014 | | |
| --- | --- | --- | --- |
| | Interest Method | Cost Recovery Method | Total |
| Balance beginning of period, as revised | $ — | $ 54,239,000 | $ 54,239,000 |
| Acquisition of receivable portfolios | — | 2,733,000 | 2,733,000 |
| Net cash collections from collection of consumer receivables acquired for liquidation | — | (10,039,000) | (10,039,000) |
| Net cash collections represented by account sales of consumer receivables acquired for liquidation | — | (2,000) | (2,000) |
| Impairment | — | (19,591,000) | (19,591,000) |
| Finance income recognized (1) | — | 5,074,000 | 5,074,000 |
| Balance, end of period | $ — | $ 32,414,000 | $ 32,414,000 |
| Finance income as a percentage of collections | — % | 50.5% | 50.5% |

**ASTA FUNDING, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**Note 4—Consumer Receivables Acquired for Liquidation** *(continued)*

Accretable yield represents the amount of finance income the Company can expect to generate over the remaining life of its existing portfolios based on estimated future net cash flows. Since all of the remaining interest method portfolios were transferred to cost recovery as of June 30, 2014, there are no accretable yield balances in fiscal year 2015. There were no accretable yield adjustments in the nine and three month periods ended June 30, 2014. Changes in accretable yield for the nine month and three month periods ended June 30, 2014 are as follows:

|  | Nine Months Ended June 30, 2014 | Three Months Ended June 30, 2014 |
|---|---|---|
| Balance at beginning of period | $ 7,679,000 | $ — |
| Transfer cost recovery effective October 1, 2013 | (7,679,000) | — |
| Balance at end of period | $ — | $ — |

During the nine and three month periods ended June 30, 2015, the company purchased $28.0 million and $3.6 million, respectively, of face value portfolios, at a cost of $2.0 million and $0.4 million, respectively. During the nine and three month periods ended June 30, 2014, the Company purchased $53.0 million and $35.9 million, respectively, of face value portfolios, at a cost of $3.7 million and $2.7 million, respectively. All of these portfolio purchases are accounted for on the cost recovery method.

The following table summarizes collections on a gross basis as received by the Company's third-party collection agencies and attorneys, less commissions and direct costs for the nine and three month periods ended June 30, 2015 and 2014, respectively:

|  | For the Nine Months Ended June 30, | |
|---|---|---|
|  | 2015 | 2014 |
| Gross collections | $ 43,697,000 | $ 51,884,000 |
| Commissions and fees (1) | 15,440,000 | 21,141,000 |
| Net collections | $ 28,257,000 | $ 30,743,000 |

|  | For the Three Months Ended June 30, | |
|---|---|---|
|  | 2015 | 2014 |
| Gross collections | $ 13,917,000 | $ 18,192,000 |
| Commissions and fees (1) | 5,079,000 | 8,151,000 |
| Net collections | $ 8,838,000 | $ 10,041,000 |

(1)   Commissions and fees are the contractual commission earned by third party collection agencies and attorneys, and direct costs associated with the collection effort, generally court costs. Includes a 3% fee charged by a servicer on gross collections received by the Company in connection with the Portfolio Purchase. Such arrangement was consummated in December 2007. The fee is charged for asset location, skip tracing and ultimately suing debtors in connection with this portfolio purchase.

**ASTA FUNDING, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**Note 5—Acquisition of CBC**

On December 31, 2013, the Company acquired 80% ownership of CBC and its affiliate, CBC Management Services, LLC, for approximately $5.9 million. In addition, the Company will provide financing to CBC of up to $5 million. The 20% non-controlling interests are held by two of the original owners of CBC. The fair value of non-controlling interests at the acquisition date was determined to be immaterial. The non-controlling interests will not be entitled to any distributions from CBC until the Company receives distributions of $2,337,190. The non-controlling interests are entitled to two of the five seats of CBC's Board of Managers and have the right to approve certain material transactions of CBC. The non-controlling interests owners are employed by CBC. If the employment is terminated, other than for cause, CBC could be required to purchase their membership interest in CBC. If the employment is terminated for any other reason, CBC has the right to purchase their non-controlling interests. The purchase price would be determined by a third party appraiser and is payable over a period of time. The fair value of the put right was determined to be $0 at December 31, 2013. No re-measurement is required at June 30, 2015 as it is not probable that the put option will become redeemable. The acquisition provided the Company with the opportunity to further diversify its portfolio.

CBC purchases periodic structured settlements and annuity policies from individuals in exchange for a lump sum payment. The Company accounted for this purchase in accordance with ASC Topic 805 "Business Combinations". Under this guidance, an entity is required to recognize the assets acquired and liabilities assumed and the consideration given at their fair value on the acquisition date. The following table summarizes the fair value of the assets acquired and the liabilities assumed as of the December 31, 2013 acquisition date:

| | |
|---|---:|
| Cash | $ 351,000 |
| Structured settlements | 30,436,000 |
| Other assets | 11,000 |
| Other liabilities | (356,000) |
| Other debt (see Note 11: Other debt – CBC (including non-recourse notes payable amounting to $13.8 million) | (25,863,000) |
| Total identifiable net assets acquired | 4,579,000 |
| Goodwill (see Note 9: Goodwill) | 1,360,000 |
| Purchase Price | $ 5,939,000 |

As the transaction consummated on December 31, 2013, there were no actual operational results that were attributable to the Company in the first quarter of fiscal year 2014. Total revenues, as reported, for the nine months ended June 30 of fiscal year 2014, were $23,710,000. On a pro forma basis, total revenues for the nine months ended June 30, 2014 would have been $25,345,000. Net income attributable to Asta Funding, Inc., as reported, for the nine months ended June 30, 2014, was $5,709,000. On a pro forma basis, net income attributable to Asta Funding, Inc. for the nine months ended June 30, 2014 would have been $5,751,000.

16

**ASTA FUNDING, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**Note 6—Structured Settlements (at Fair Value)**

CBC purchases periodic payments under structured settlements and annuity policies from individuals in exchange for a lump sum payment. The Company elected to carry the structured settlements at fair value. Unearned income on structured settlements is recognized as interest income using the effective interest method over the life of the related structured settlement. Changes in fair value are recorded in unrealized gain (loss) on structured settlements in the Company's statements of income.

We elected the fair value treatment under ASC 825 Section 10-28 through 50-32 to be transparent to the user regarding the underlying fair value of the structured settlement which collateralizes the debt of CBC. The Company believes any change in fair value is driven by market risk as opposed to credit risk associated with the underlying structured settlement annuity issuer.

The purchased personal injury structured settlements result in payments over time through an annuity policy. Most of the annuities acquired involve guaranteed payments with specific defined ending dates. CBC also purchases a small number of life contingent annuity payments with specific ending dates but the actual payments to be received could be less due to the mortality risk associated with the measuring life. CBC records a provision for loss each period. The life contingent annuities are not a material portion of assets at June 30, 2015 and revenue for the nine month period ended June 30, 2015.

Structured settlements consist of the following as of June 30, 2015 and September 30, 2014:

|  | June 30, 2015 | September 30, 2014 |
|---|---|---|
| Maturity | $ 88,899,000 | $ 64,852,000 |
| Unearned income | (32,332,000) | (22,773,000) |
| Net collections | $ 56,567,000 | $ 42,079,000 |

Encumbrances on structured settlements as of June 30, 2015 and September 30, 2014 are as follows:

|  | June 30, 2015 | September 30, 2014 |
|---|---|---|
| Notes payable secured by settlement receivables with principal and interest outstanding payable until June 2025 (1) | $ 2,367,000 | $ 2,521,000 |
| Notes payable secured by settlement receivables with principal and interest outstanding payable until August 2026 (1) | 4,815,000 | 5,363,000 |
| Notes payable secured by settlement receivables with principal and interest outstanding payable until April 2032 (1) | 4,559,000 | 4,828,000 |
| Notes payable secured by settlement receivables with principal and interest outstanding payable until February 2037 (1) | 20,565,000 | — |
| Revolving line of credit—$25,000,000 at June 30, 2015 and $22,000,000 at September 30, 2014 (1) | 14,398,000 | 19,583,000 |
| Encumbered structured settlements | 46,704,000 | 32,295,000 |
| Structured settlements not encumbered | 9,863,000 | 9,784,000 |
| Total structured settlements | $56,567,000 | $ 42,079,000 |

(1) See Note 11 – Other Debt – CBC

At June 30, 2015, the expected cash flows of structured settlements based on maturity value are as follows:

| September 30, 2015 (3 months) | $ 1,760,000 |
|---|---|
| September 30, 2016 | 6,494,000 |
| September 30, 2017 | 6,223,000 |
| September 30, 2018 | 5,319,000 |
| September 30, 2019 | 5,562,000 |
| Thereafter | 63,541,000 |
| Total | $88,899,000 |

17

**ASTA FUNDING, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**Note 7—Other Investments**

*Personal Injury Claims*

Pegasus purchases interests in personal injury claims from claimants who are a party to personal injury litigation. Pegasus advances to each claimant funds on a non-recourse basis at an agreed upon interest rate, in anticipation of a future settlement. The interest in each claim purchased by Pegasus consists of the right to receive, from such claimant, part of the proceeds or recoveries which such claimant receives by reason of a settlement, judgment or award with respect to such claimant's claim. The Company, through Pegasus, earned $6.1 million and $2.5 million, in interest and fees during the nine and three month periods ending June 30, 2015, respectively, compared to $5.7 million and $1.7 million, respectively, during the nine and three month periods ending June 30, 2014. The Company had a net invested balance of $37.2 million and $32.4 million on June 30, 2015 and September 30, 2014, respectively. Pegasus records reserves for bad debts, which, at June 30, 2015, amounted to $5.0 million as follows:

| | Nine Months Ended June 30, 2015 | Three Months Ended June 30, 2015 |
|---|---|---|
| Balance at beginning of period | $ 2,474,000 | $ 4,446,000 |
| Provisions for losses | 3,011,000 | 690,000 |
| Write offs | (470,000) | (121,000) |
| Balance at end of period | $ 5,015,000 | $ 5,015,000 |

*Matrimonial Claims (included in Other Assets)*

On May 18, 2012, the Company formed BP Case Management, LLC ("BPCM"), a joint venture with California-based Balance Point Divorce Funding, LLC ("BP Divorce Funding"). BPCM provides non-recourse funding to a spouse in a matrimonial action. The Company provided a $1.0 million revolving line of credit to partially fund BP Divorce Funding's operations, with such loan bearing interest at the prevailing prime rate, with an initial term of twenty-four months. In September 2014, the agreement was revised to extend the terms of the loan to August 2016, increase the line of credit to $1.5 million and include a personal guarantee of the principal of BP Divorce Funding. The loan balance at June 30, 2015 was approximately $1.5 million. The revolving line of credit is collateralized by BP Divorce Funding's profit share in BPCM and other assets. As of June 30, 2015, the Company's investment in cases through BPCM was approximately $2.5 million. There was no income recognized in the first nine months of fiscal years 2015 and 2014.

**Note 8—Furniture & Equipment**

Furniture and equipment consist of the following as of the dates indicated:

| | June 30, 2015 | September 30, 2014 |
|---|---|---|
| Furniture | $ 337,000 | $ 323,000 |
| Equipment | 3,622,000 | 3,622,000 |
| Software | 1,335,000 | 1,211,000 |
| Leasehold improvements | 99,000 | 99,000 |
| | 5,393,000 | 5,255,000 |
| Less accumulated depreciation | 4,958,000 | 4,499,000 |
| Balance, end of period | $ 435,000 | $ 756,000 |

**Note 9—Goodwill**

Goodwill represents the excess of the purchase price of an acquired business over the fair value of amounts assigned to assets acquired and liabilities assumed. Goodwill is reviewed for impairment if events or circumstances indicate that impairment may be present. Any excess in carrying value over the estimated fair value is recorded as impairment loss and charged to results of operations in the period such determination is made. For each of the nine and three month periods ended June 30, 2015 and 2014, management has determined that there was no impairment loss required to be recognized in the carrying value of goodwill.

18

**ASTA FUNDING, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**Note 9—Goodwill** *(continued)*

The goodwill balances at June 30, 2015 and September 30, 2014 are as follows:

| | June 30, 2015 | September 30, 2014 |
|---|---|---|
| Balance at beginning of period | $2,770,000 | $ 1,410,000 |
| Goodwill from acquisition (see Note 5: Acquisition of CBC) | — | 1,360,000 |
| Balance at end of period | $2,770,000 | $ 2,770,000 |

**Note 10—Non Recourse Debt**

*Non-Recourse Debt –Bank of Montreal ("BMO")*

In March 2007, Palisades XVI borrowed approximately $227 million under the Receivables Financing Agreement, as amended in August 2013 from Bank of Montreal (BMO), in order to finance the Portfolio Purchase which had a purchase price of $300 million. The original term of the agreement was three years. This term was extended by the most recent agreement signed in August 2013.

On August 7, 2013, Palisades XVI, a 100% owned bankruptcy remote subsidiary, entered into a Settlement Agreement and Omnibus Amendment (the "Settlement Agreement") with BMO as an amendment to the RFA. In consideration for a $15 million prepayment funded by the Company, BMO agreed to significantly reduce minimum monthly collection requirements and the interest rate. If and when BMO receives the next $15 million of collections from the Portfolio Purchase or from voluntary prepayments by Asta Funding, Inc., less certain credits for payments made prior to the consummation of the Settlement Agreement (the "Remaining Amount"), Palisades XVI and its affiliates would be automatically released from liability in connection with the RFA (subject to customary exceptions). A condition to the release was Palisade XVI's agreement to grant BMO, as of the time of the payment of the Remaining Amount, the right to receive 30% of net collections from the Portfolio Purchase once Palisades XVI has received from future net collections, the sum of $15 million plus voluntary prepayments included in the payment of the Remaining Amount (the "Income Interest"). The Company estimated the Income Interest to be between $0 and $1.4 million. However, the Company believes that no amount would be incurred because of the continued deterioration of collections from the Portfolio Purchase.

On June 3, 2014, Palisades XVI paid the Remaining Amount. The final principal payment of $2,901,199 included a voluntary prepayment of $1,866,036 provided from funds of the Company. Accordingly, Palisades XVI will be entitled to receive $16.9 million of future collections from the Portfolio Purchase before BMO is entitled to receive any payments with respect to its Income Interest.

With the payment of the Remaining Amount and upon completion of the documents granting the Palisades XVI Income Interest, including a written confirmation from BMO that the obligation has been paid in full, Palisades XVI was released from further debt obligations from the RFA. The Company recorded as other income, forgiveness of non-recourse debt, in the amount of approximately $26.1 million, pre-tax in the third quarter of fiscal year 2014.

*Bank Hapoalim B.M. ("Bank Hapoalim") Line of Credit*

On May 2, 2014, the Company obtained a $20 million line of credit facility from Bank Hapoalim, pursuant to a Loan Agreement (the "Loan Agreement") among the Company and its subsidiary, Palisades Collection, LLC, as borrowers ("the Borrowers"), and Bank Hapoalim, as agent and lender. The Loan Agreement provides for a $20 million committed line of credit and an accordion feature providing an increase in the line of credit of up to $30 million, at the discretion of the lenders. The facility is for a term of three years at an interest rate of either, LIBOR plus 275 basis points or prime, at the Company's option. The Loan Agreement includes covenants that require the Company to maintain a minimum net worth of $150 million and pay an unused line fee. The facility is secured pursuant to a Security Agreement ("Security Agreement") among the parties to the Loan Agreement, with property of the Borrowers serving as collateral. Through the period ended June 30, 2015, the Company has not used this facility.

**ASTA FUNDING, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**Note 11—Other Debt—CBC**

The Company assumed $25.9 million of debt related to the CBC acquisition (see Note 5) on December 31, 2013. On the same date, the Company paid down $2.5 million of the debt. On March 27, 2014, CBC entered into the Sixth Amendment, whereby it increased its revolving line of credit from $12.5 million to $15.0 million, the interest rate floor was reduced from 5.5% to 4.75% and the commitment was extended to February 28, 2015. The amendment also included changes in carrier concentration ratios and removal of the personal guarantees of the general managers and non-controlling interest partners. On July 15, 2014, CBC entered into the Seventh Amendment, extending the revolving line of credit to $20.0 million. On September 29, 2014, CBC entered into the Eighth Amendment, further extending the credit line to $22.0 million. On March 11, 2015, CBC entered into the Ninth Amendment. This amendment, effective March 1, 2015, extended the maturity date on its credit line from February 28, 2015 to March 1, 2017. Additionally, the credit line was increased from $22.0 million to $25.0 million and the interest rate floor was decreased from 4.75% to 4.1%. Other terms and conditions were materially unchanged. On November 26, 2014, CBC completed its fourth private placement, backed by structured settlement and fixed annuity payments. CBC issued, through its subsidiary, BBR IV, LLC, approximately $21.8 million of fixed rate asset-backed notes with a yield of 5.4%. As of June 30, 2015, the remaining debt amounted to $46.7 million, which consisted of $14.4 million drawdown from a line of credit from an institutional source and $32.3 million notes issued by entities 100%-owned and consolidated by CBC. These entities are bankruptcy-remote entities created to issue notes secured by structured settlements. The following table details the other debt at June 30, 2015 and September 30, 2014:

|  | Interest Rate | June 30, 2015 | September 30, 2014 |
|---|---|---|---|
| Notes payable secured by settlement receivables with principal and interest outstanding payable until June 2025 | 8.75% | $  2,367,000 | $  2,521,000 |
| Notes payable secured by settlement receivables with principal and interest outstanding payable until August 2026 | 7.25% | 4,815,000 | 5,363,000 |
| Notes payable secured by settlement receivables with principal and interest outstanding payable until April 2032 | 7.125% | 4,559,000 | 4,828,000 |
| Notes payable secured by settlement receivables with principal and interest outstanding payable until February 2037 | 5.39% | 20,565,000 | — |
| Subtotal notes payable |  | 32,306,000 | 12,712,000 |
| $25,000,000 revolving line of credit expiring on March 1, 2017 | 4.1% | 14,398,000 | 19,583,000 |
| Total debt – CBC |  | $46,704,000 | $ 32,295,000 |

**Note 12—Commitments and Contingencies**

*Leases*

The Company leases its facilities in Englewood Cliffs, New Jersey, Houston, Texas, New York, New York and Conshohocken, Pennsylvania.

*Litigation*

In the ordinary course of its business, the Company is involved in numerous legal proceedings. The Company regularly initiates collection lawsuits, using its network of third party law firms, against consumers. Also, consumers occasionally initiate litigation against the Company, in which they allege that the Company has violated a federal or state law in the process of collecting their account. The Company does not believe that these matters are material to its business or financial condition. The Company is not involved in any material litigation in which it is a defendant.

**ASTA FUNDING, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**Note 13—Finance Income Recognition, Impairments, and Commissions and Fees**

*Income Recognition*

The Company can account for certain of its investments in finance receivables using the interest method under the guidance of ASC 310-30. Under the guidance of ASC 310-30, static pools of accounts are established. These pools are aggregated based on certain common risk criteria. Each static pool is recorded at cost and is accounted for as a single unit for the recognition of income, principal payments and loss provision. Effective October 1, 2013, due to the substantial reduction of portfolios reported under the interest method, and the ability to reasonably estimate cash collections required to account for those portfolios under the interest method the Company concluded the cost recovery method is the appropriate accounting method under the circumstances.

Despite all of the Company's portfolios being on the cost recovery method, the Company must still analyze a portfolio upon acquisition and once a static pool is established for a quarter, individual receivable accounts are not added to the pool (unless replaced by the seller) or removed from the pool (unless sold or returned to the seller). ASC 310 requires that the excess of the contractual cash flows over expected cash flows not be recognized as an adjustment of revenue or expense or on the balance sheet. For portfolios accounted for using the interest method, ASC 310-30 initially freezes the internal rate of return, referred to as IRR, estimated when the accounts receivable are purchased, as the basis for subsequent impairment testing. Significant increases in actual or expected future cash flows may be recognized prospectively through an upward adjustment of the IRR over a portfolio's remaining life. Any increase to the IRR then becomes the new benchmark for impairment testing. Rather than lowering the estimated IRR if the collection estimates are not received or projected to be received, the carrying value of a pool would be impaired, or written down to maintain the then current IRR. Under the interest method, income is recognized on the effective yield method based on the actual cash collected during a period and future estimated cash flows and timing of such collections and the portfolio's cost. Material variations of cash flow estimates are recorded in the quarter such variations are determined. The estimated future cash flows are reevaluated quarterly.

Finance income is recognized on cost recovery portfolios after the carrying value has been fully recovered through collections or amounts written down.

The Company accounts for its investments in personal injury claims at an agreed upon interest rate, in anticipation of a future settlement. The interest purchased by Pegasus in each claim consists of the right to receive from such claimant part of the proceeds or recoveries which such claimant receives by reason of a settlement, judgment or reward with respect to such claimant's claim. Open case revenue is estimated, recognized and accrued at a rate based on the expected realization and underwriting guidelines and facts and circumstances for each individual case. These personal injury claims are non-recourse. When a case is closed and the cash is received for the advance provided to a claimant, income is recognized based upon the contractually agreed upon interest rate, and, if applicable, adjusted for any changes due to a settled amount and fees charged to the claimant.

The funding of BPCM matrimonial actions is on a non-recourse basis. BPCM income is recognized under the cost recovery method.

CBC purchases periodic payments under structured settlements and annuity policies from individuals in exchange for a lump sum payment. The Company elected to carry structured settlements at fair value. Unearned income on structured settlements is recognized as interest income using the effective interest method over the life of the related settlement. Changes in fair value are recorded in unrealized gain (loss) in structured settlements in our statements of income.

The Company recognizes revenue for GAR Disability Advocates as fees are earned when cases close and the fees are paid.

*Impairments*

In accordance with ASC 310-30, which provides guidance on how to account for differences between contractual and expected cash flows from an investor's initial investment in loans or debt securities acquired in a transfer if those differences are attributable, at least in part, to credit quality, increases in expected cash flows are recognized prospectively through an adjustment of the internal rate of return while decreases in expected cash flows are recognized as impairments. If it is determined a portfolio accounted for on the cost recovery method will not recover the current book value of the portfolio, impairment would be recorded. There were no impairments recorded during the three and nine month periods ended June 30, 2015. There were $19.6 million of impairments recorded during the third quarter of fiscal year 2014.

**ASTA FUNDING, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**Note 13—Income Recognition, Impairments, and Commissions and Fees** *(continued)*

*Impairments (continued)*

The Company's analysis of the timing and amount of cash flows to be generated by our portfolio purchases are based on the following attributes:

- the type of receivable,

- the average balance of the receivables

- the age of the receivables;

- past history and performance of similar assets acquired

- the Company's ability to analyze accounts and resell accounts that meet its criteria;

- jobs or property of the debtors found within portfolios.; and

- credit standards of the issue

*Commissions and fees*

      Commissions and fees are the contractual commissions earned by third party collection agencies and attorneys, and direct costs associated with the collection effort, generally court costs. The Company expects to continue to purchase portfolios and utilize third party collection agencies and attorney networks.

**Note 14—Income Taxes**

      Deferred federal and state taxes principally arise from (i) recognition of finance income collected for tax purposes, but not yet recognized for financial reporting; (ii) provision for impairments/credit losses; and (iii) stock based compensation expense for stock option grants and restricted stock awards recorded in the statement of operations for which no cash distribution has been made. Other components consist of state net operating loss ("NOL") carry-forwards, which expire in September 2029. The New Jersey NOL carryforward balance as of June 30, 2015 is approximately $110.0 million. As of June 30, 2015, the Company has accrued $507,000 of interest, classified in the income tax line in the statement of operations. The provision for income tax expense for the three month periods ended June 30, 2015 and 2014 reflects income tax expense at an effective rate of 23.19% and 38.7%, respectively. The provision for income tax expense for the nine month periods ended June 30, 2015 and 2014 reflects income tax expense at an effective rate of 45.7% and 38.1%, respectively. If the $507,000 interest were excluded from the income tax expense, the effective tax rate for the nine months ended June 30, 2015 would have been 22.3%.

      The corporate federal income tax returns of the Company for the years 2009 through 2014 are subject to examination by the Internal Revenue Service ("IRS"), generally for three years after they are filed. The state income tax returns and other state filings of the Company are subject to examination by the state taxing authorities, for various periods generally up to four years after they are filed.

      On July 16, 2015, the Company made a payment to the IRS of approximately $13 million in anticipation of the conclusion of the examination by the IRS and in accordance with their notice of proposed adjustment, for the fiscal tax years ended September 30, 2009 through September 30, 2013. In addition, as of June 30, 2015, the Company has accrued $507,000 of interest, classified in the income tax line of the statements of operations. (See Note 21–Subsequent Events for more information).

22

**ASTA FUNDING, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**Note 15— Net Income per Share**

Basic per share data is calculated by dividing net income by the weighted average shares outstanding during the period. Diluted earnings per share is calculated similarly, except that it includes the dilutive effect of the assumed exercise of securities, including the effect of shares issuable under the Company's stock based compensation plans. With respect to the assumed proceeds from the exercise of dilutive options, the treasury stock method is calculated using the average market price for the period.

The following table presents the computation of basic and diluted per share data for the Nine Months ended June 30, 2015 and 2014:

|  | Nine Months Ended June 30, 2015 | | | Nine Months Ended June 30, 2014 | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | Net Income | Weighted Average Shares | Per Share Amount | Net Income | Weighted Average Shares | Per Share Amount |
| Basic | $876,000 | 13,044,905 | $ 0.07 | $5,709,000 | 12,979,472 | $ 0.44 |
| Effect of Dilutive Stock | — | 266,871 | | — | 228,543 | (0.01) |
| Diluted | $876,000 | 13,311,776 | $ 0.07 | $5,709,000 | 13,208,015 | $ 0.43 |

At June 30, 2015, 413,387 options at a weighted average exercise price of $9.59 were not included in the diluted earnings per share calculation as they were antidilutive.

At June 30, 2014, 1,088,304, options at a weighted average exercise price of $11.88 were not included in the diluted earnings per share calculation as they were antidilutive.

The following table presents the computation of basic and diluted per share data for the three months ended June 30, 2015 and 2014:

|  | Three Months Ended June 30, 2015 | | | Three Months Ended June 30, 2014 | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | Net Income | Weighted Average Shares | Per Share Amount | Net Income | Weighted Average Shares | Per Share Amount |
| Basic | $161,000 | 13,060,839 | $ 0.01 | $4,687,000 | 12,984,882 | $ 0.36 |
| Effect of Dilutive Stock | | 252,567 | — | | 229,821 | (0.01) |
| Diluted | $161,000 | 13,313,406 | $ 0.01 | $4,687,000 | 13,214,703 | $ 0.35 |

23

**ASTA FUNDING, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**Note 16—Stock Based Compensation**

The Company accounts for stock-based employee compensation under ASC 718, Compensation — Stock Compensation ("ASC 718"). ASC 718 requires that compensation expense associated with stock options and other stock based awards be recognized in the statement of operations, rather than a disclosure in the notes to the Company's consolidated financial statements.

In February 2015, the Compensation Committee of the Board of Directors of the Company ("Compensation Committee") granted 45,400 options to employees of the Company. The exercise price of these options, issued on February 23, 2015, was at the market price on that date. The options generally vest in three equal annual installments and are accounted for as one graded vesting award. The weighted average assumptions used in the option pricing model were as follows:

| | |
|---|---|
| Risk-free interest rate | 0.12% |
| Expected term (years) | 5.9 |
| Expected volatility | 32.7% |
| Dividend yield | 0.00% |

On October 2, 2014, the Compensation Committee of the Board of Directors of the Company ("Compensation Committee") granted 15,000 restricted shares to an employee of the Company. These shares vest in three equal installments, starting on the first anniversary of the grant.

In February 2014, the Compensation Committee of the Board of Directors of the Company ("Compensation Committee") granted 5,000 options to a former employee for past services. The exercise price of these options, issued on February 4, 2014, was at the market price on that date. The options vested immediately. The weighted average assumptions used in the option pricing model were as follows:

| | |
|---|---|
| Risk-free interest rate | 0.06% |
| Expected term (years) | 5.9 |
| Expected volatility | 35.3% |
| Dividend yield | 0.00% |

In December 2013, the Compensation Committee granted 156,700 stock options, of which 70,000 options were awarded to the Officers of the Company and the remaining 86,700 stock options were awarded to non-officer employees of the Company. The exercise price of these options, issued on December 12, 2013, was at the market price on that date. The options vest in three equal annual installments and are accounted for as one graded vesting award. The weighted average assumptions used in the option pricing model were as follows:

| | |
|---|---|
| Risk-free interest rate | 0.08% |
| Expected term (years) | 6.5 |
| Expected volatility | 98.3% |
| Dividend yield | 0.00% |

**Note 17—Stock Option Plans**

*2012 Stock Option and Performance Award Plan*

On February 7, 2012, the Board of Directors adopted the Company's 2012 Stock Option and Performance Award Plan (the "2012 Plan"), which was approved by the stockholders of the Company on March 21, 2012. The 2012 Plan replaces the Equity Compensation Plan (as defined below).

The 2012 Plan provides the Company with flexibility with respect to equity awards by providing for grants of stock awards (i.e. restricted or unrestricted), stock purchase rights and stock appreciation rights, in addition to the granting of stock options.

The Company authorized 2,000,000 shares of Common Stock for issuance under the 2012 Plan. Under the 2012 Plan, the Company has granted options to purchase an aggregate of 417,100 shares and aggregate awards of 117,321 shares of restricted stock, and has cancelled 45,600 options, leaving 1,511,179 shares available as of June 30, 2015. As of June 30, 2015, approximately 93 of the Company's employees were able to participate in the 2012 Plan.

24

**ASTA FUNDING, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**Note 17—Stock Option Plans** *(continued)*

*Equity Compensation Plan*

On December 1, 2005, the Board of Directors adopted the Company's Equity Compensation Plan (the "Equity Compensation Plan"), which was approved by the stockholders of the Company on March 1, 2006. The Equity Compensation Plan was adopted to supplement the Company's 2002 Stock Option Plan (as defined below). In addition to permitting the grant of stock options as are permitted under the 2002 Stock Option Plan, the Equity Compensation Plan allows the Company flexibility with respect to equity awards by also providing for grants of stock awards (i.e. restricted or unrestricted), stock purchase rights and stock appreciation rights.

The Company authorized 1,000,000 shares of Common Stock for issuance under the Equity Compensation Plan. As of March 21, 2012, no more awards could be issued under this plan

*2002 Stock Option Plan*

On March 5, 2002, the Board of Directors adopted the Company's 2002 Stock Option Plan (the "2002 Plan"), which plan was approved by the stockholders of the Company on May 1, 2002. The 2002 Plan was adopted in order to attract and retain qualified directors, officers and employees of, and consultants to, the Company.

The 2002 Plan authorizes the granting of incentive stock options (as defined in Section 422 of the Internal Revenue Code of 1986, as amended (the "Code")) and non-qualified stock options to eligible employees of the Company, including officers and directors of the Company (whether or not employees) and consultants of the Company.

The Company authorized 1,000,000 shares of Common Stock authorized for issuance under the 2002 Plan. As of March 5, 2012, no more awards could be issued under this plan.

**Summary of the Plans**

Compensation expense for stock options and restricted stock is recognized over the vesting period. Compensation expense for restricted stock is based upon the market price of the shares underlying the awards on the grant date.

The following table summarizes stock option transactions under the 2012 Plan, the 2002 Plan, and the Equity Compensation Plan:

| | Nine Months Ended June 30, | | | |
| | 2015 | | 2014 | |
| | Shares | Weighted Average Exercise Price | Shares | Weighted Average Exercise Price |
|---|---|---|---|---|
| Outstanding options at the beginning of period | 1,403,259 | $ 10.78 | 1,622,771 | $ 11.31 |
| Options granted | 45,400 | 8.37 | 161,700 | 8.48 |
| Options exercised | (60,000) | 7.83 | (11,500) | 3.46 |
| Options forfeited/canceled | (344,259) | 17.99 | (210,767) | 14.87 |
| Outstanding options at the end of period | 1,044,400 | $ 8.47 | 1,562,204 | $ 10.66 |
| Exercisable options at the end of period | 861,725 | $ 8.41 | 987,198 | $ 11.97 |

| | Three Months Ended June 30, | | | |
| | 2015 | | 2014 | |
| | Shares | Weighted Average Exercise Price | Shares | Weighted Average Exercise Price |
|---|---|---|---|---|
| Outstanding options at the beginning of period | 1,044,400 | $ 8.47 | 1,563,704 | $ 10.65 |
| Options granted | — | — | — | — |
| Options exercised | — | — | (1,500) | 6.89 |
| Options forfeited/canceled | — | — | — | — |
| Outstanding options at the end of period | 1,044,400 | $ 8.47 | 1,562,204 | $ 10.66 |
| Exercisable options at the end of period | 861,725 | $ 8.41 | 987,198 | $ 11.97 |

25

**ASTA FUNDING, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**Note 17—Stock Option Plans** *(continued)*

The following table summarizes information about the 2012 Plan, the 2002 Plan, and the Equity Compensation Plan outstanding options as of June 30, 2015:

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| **Range of Exercise Price** | **Weighted Number Outstanding** | **Weighted Remaining Contractual Life (in Years)** | **Weighted Average Exercise Price** | **Number Exercisable** | **Weighted Average Exercise Price** |
| $2.8751 – $5.7500 | 7,100 | 3.8 | $ 2.95 | 7,100 | $ 2.95 |
| $5.7501 – $8.6250 | 848,300 | 6.4 | 7.96 | 723,629 | 7.88 |
| $8.6251 – $11.5000 | 174,000 | 7.6 | 9.40 | 115,996 | 9.40 |
| $11.5001 – $28.7500 | 15,000 | 1.5 | 28.75 | 15,000 | 28.75 |
| | 1,044,400 | 6.5 | $ 8.47 | 861,725 | $ 8.41 |

The Company recognized $858,000 and $202,000 of compensation expense related to stock option during the nine and three month periods ended June 30, 2015, respectively. The Company recognized $1,046,000 and $367,000 of compensation expense related to stock options during the nine and three months ended June 30, 2014, respectively. As June 30, 2015, there was $865,000 of unrecognized compensation cost related to stock option awards. The weighted average period over which such costs are expected to be recognized is 1.2 years.

The intrinsic value of the outstanding and exercisable options as of June 30, 2015 was each approximately $409,000. The weighted average remaining contractual life of exercisable options is 6.1 years. The intrinsic and fair value of options exercised during the nine month period ended June 30, 2015 was approximately $76,000 and $525,000, respectively. There were no options exercised in the three month period ended June 30, 2015. The intrinsic value and the fair value of the options exercised during both the nine and three month periods ended June 30, 2014 was approximately $57,000 and $95,000, respectively. The intrinsic value and fair value of options exercised during the three month period ended June 30, 2014 was approximately $2,000 and $12,000, respectively. The proceeds from the exercise of stock options during the nine and three month periods ended June 30, 2015 were approximately $469,000. The proceeds from the exercise of stock options during the nine and three month periods ended June 30, 2014 were approximately $40,000 and $10,000, respectively. There was no tax effect associated with these exercises. The fair value of the stock options that vested during the nine and three month periods ended June 30, 2015 was approximately $3,145,000 and $95,000, respectively. The fair value of the stock options that vested during the nine and three month periods ended June 30, 2014 was approximately $743,000 and $137,000, respectively. The fair value of the awards granted during the nine and three month periods ended June 30, 2015 was $405,000 and $0, respectively. The fair value of the awards granted during the nine and three month periods ended June 30, 2014 was $1,372,000 and $0, respectively.

26

**ASTA FUNDING, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

Note 17— **Stock Option Plans** *(continued)*

The following table summarizes information about restricted stock transactions:

| | Nine Months Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2015** | | | **2014** | |
| | **Shares** | **Weighted Average Grant Date Fair Value** | | **Shares** | **Weighted Average Grant Date Fair Value** |
| Unvested at the beginning of period | 68,214 | $ 9.57 | | 102,321 | $ 9.57 |
| Awards granted | 15,000 | 8.30 | | — | — |
| Vested | (34,107) | 9.57 | | (34,107) | 9.57 |
| Forfeited | — | — | | — | — |
| Unvested at the end of period | 49,107 | $ 9.18 | | 68,214 | $ 9.57 |

| | Three Months Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2015** | | | **2014** | |
| | **Shares** | **Weighted Average Grant Date Fair Value** | | **Shares** | **Weighted Average Grant Date Fair Value** |
| Unvested at the beginning of period | 49,107 | $ 9.18 | | 68,214 | $ 9.57 |
| Awards granted | — | — | | — | — |
| Vested | — | — | | — | — |
| Forfeited | — | — | | — | — |
| Unvested at the end of period | 49,107 | $ 9.18 | | 68,214 | $ 9.57 |

The Company recognized $278,000 and $93,000 of compensation expense related to restricted stock awards during the nine and three month periods ended June 30, 2015, respectively. The Company recognized $244,000 and $82,000 of compensation expense related to the restricted stock awards during the nine and three month periods ended June 30, 2014, respectively. As of June 30, 2015, there was $244,000 of unrecognized compensation cost related to restricted stock awards. The weighted average remaining period over which such costs are expected to be recognized is 1.1 years. The fair value of the restricted stock awards granted during the first quarter of fiscal year 2015 was approximately $125,000. There were no restricted stock awards granted during the first nine months of fiscal year 2014. The fair value of the awards vested during the nine month periods ended June 30, 2015 and 2014 was $326,000 for both periods. There were no awards vested in the third quarter of fiscal years 2015 and 2014.

The Company recognized an aggregate total of $1,136,000 and $295,000, respectively, in compensation expense for the nine and three month periods ended June 30, 2015, for the stock options and restricted stock grants. The Company recognized an aggregate of $1,290,000 and $449,000, respectively, for the nine and three month periods ended June 30, 2014, for the stock options and restricted stock grants. As of June 30, 2015, there was a total of $1,109,000 of unrecognized compensation cost related to unvested stock options and restricted stock grants. The method used to calculate stock based compensation is the straight line pro-rated method.

**Note 18—Stockholders' Equity**

There were no dividends declared or paid during the three or nine months ended June 30, 2015 and 2014.

Dividends are declared at the discretion of the board of directors and depend upon the Company's financial condition, operating results, capital requirements and other factors that the board of directors deems relevant. In addition, agreements with the Company's lenders may, from time to time, restrict the ability to pay dividends. As of June 30, 2015, there were no such restrictions.

ASTA FUNDING, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(Unaudited)

**Note 19—Fair Value of Financial Measurements and Disclosures**

*Disclosures about Fair Value of Financial Instruments*

FASB ASC 825, Financial Instruments, ("ASC 825"), requires disclosure of fair value information about financial instruments, whether or not recognized on the balance sheet, for which it is practicable to estimate that value. Because there are a limited number of market participants for certain of the Company's assets and liabilities, fair value estimates are based upon judgments regarding credit risk, investor expectation of economic conditions, normal cost of administration and other risk characteristics, including interest rate and prepayment risk. These estimates are subjective in nature and involve uncertainties and matters of judgment, which significantly affect the estimates.

The estimated fair value of the Company's financial instruments is summarized as follows:

|  | June 30, 2015 | | September 30, 2014 | |
| --- | --- | --- | --- | --- |
|  | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| **Financial assets** | | | | |
| Available-for-sale investments (Level 1) | $69,686,000 | $69,686,000 | $66,799,000 | $66,799,000 |
| Consumer receivables acquired for liquidation (Level 3) | 18,884,000 | 38,870,000 | 29,444,000 | 50,962,000 |
| Structured settlements (Level 3) | 56,567,000 | 56,567,000 | 42,079,000 | 42,079,000 |
| Other investments (1) | 4,412,000 | 4,412,000 | — | — |
| **Financial liabilities** | | | | |
| Other debt – CBC, revolving line of credit (Level 3) | 14,398,000 | 14,398,000 | 19,583,000 | 19,583,000 |
| Other debt – CBC, non-recourse notes payable with varying installments (Level 3) | 32,306,000 | 32,306,000 | 12,712,000 | 12,712,000 |

(1)   The Company has elected to early adopt ASU 2015-07 and in accordance with ASU 2015-07, certain investments that are measured at fair value using the net asset value per share (or its equivalent) have not been classified in the fair value hierarchy. The fair value amounts presented in this table are intended to permit reconciliation of the fair value hierarchy to the amounts presented in the condensed consolidated balance sheet.

Disclosure of the estimated fair values of financial instruments often requires the use of estimates. The Company uses the following methods and assumptions to estimate the fair value of financial instruments:

Available-for-sale investments – The available-for-sale investments consist of mutual funds that are valued based on quoted prices in active markets.

Consumer receivables acquired for liquidation – The Company computed the fair value of the consumer receivables acquired for liquidation using its proprietary forecasting model. The Company's forecasting model utilizes a discounted cash flow analysis. The Company's cash flows are an estimate of collections for consumer receivables based on variables fully described in Note 4: Consumer Receivables Acquired for Liquidation. These cash flows are discounted to determine the fair value.

Structured settlements – The Company determined the fair value based on the discounted forecasted future collections of the structured settlements.

Other investments – The Company estimated the fair value using the net asset value per share of the investment. There are no unfunded commitments and the investment cannot be redeemed for 5 years.

Other debt CBC, revolving line of credit – The Company determined the fair value based on similar instruments in the market.

Other debt CBC, notes payable with varying installments – The fair value at June 30, 2015 and September 31, 2014 was based on the discounted forecasted future collections of the structured settlements.

28

**ASTA FUNDING, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**Note 19—Fair Value of Financial Measurements and Disclosures** *(continued)*

*Fair Value Hierarchy*

The Company recorded its available-for-sale investments at estimated fair value on a recurring basis. The accompanying consolidated financial statements include estimated fair value information regarding its available-for-sale investments as of June 30, 2014, as required by FASB ASC 820, Fair Value Measurements and Disclosures ("ASC 820"). ASC 820 defines fair value as the price that would be received to sell an asset or paid to transfer a liability (an exit price) in an orderly transaction between market participants on the measurement date. ASC 820 also establishes a fair value hierarchy which requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value. A financial instrument's level within the fair value hierarchy is based on the lowest level of input significant to the fair value measurement.

Level 1 – Quoted prices (unadjusted) in active markets for identical assets or liabilities that the Company has the ability to assess at the measurement date.

Level 2 – Observable inputs other than Level 1 prices, such as quoted prices for similar assets or liabilities in active markets; quoted prices in markets that are not active for identical or similar assets or liabilities; or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the asset or liability.

Level 3 – Unobservable inputs that are supported by little or no market activity and significant to the fair value of the liabilities that are developed using the reporting entities' estimates and assumptions, which reflect those that market participants would use.

The Company's available-for-sale investments are classified as Level 1 financial instruments based on the classifications described above. The Company did not have transfers into or (out of) Level 1 investments during the nine month period ended June 30, 2015. The Company had no Level 2 or Level 3 available-for-sale investments during the first nine months of fiscal year 2015.

The following table sets forth the Company's quantitative information about its Level 3 fair value measurements as of June 30, 2015:

| | Fair Value | Valuation Technique | Unobservable Input | Rate |
|---|---|---|---|---|
| Structured settlements at fair value | $56,567,000 | Discounted cash flow | Discount rate | 5.39% |

The changes in structured settlements at fair value using significant unobservable inputs (Level 3) during the nine months ended June 30, 2015 were as follows:

| | |
|---|---|
| Balance at September 30, 2014 | $42,079,000 |
| Total gains included in earnings | 4,260,000 |
| Purchases | 10,782,000 |
| Sales | — |
| Interest accreted | 3,055,000 |
| Payments received | (3,609,000) |
| Total | $56,567,000 |
| The amount of total gains for the period included in earnings attributable to the change in unrealized gains (losses) relating to assets held at June 30, 2015 | $ 4,260,000 |

Realized and unrealized gains and losses included in earnings in the accompanying consolidated statements of income for the nine months ended June 30, 2015 are reported in the following revenue categories:

| | |
|---|---|
| Total gains (losses) included in earnings in fiscal year 2015 | $4,260,000 |
| Change in unrealized gains (losses) relating to assets still held at June 30, 2015 | $4,260,000 |

29

**ASTA FUNDING, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**Note 20—Segment Reporting**

The Company operates through strategic business units that are aggregated into four reportable segments: Consumer receivables, Personal injury claims, GAR Disability Advocates and structured settlements. The four reportable segments consist of the following:

- *Consumer receivables* – segment is engaged in the business of purchasing, managing for its own account and servicing distressed consumer receivables, including charged off receivables, semi-performing receivables and performing receivables. The primary charged-off receivables are accounts that have been written-off by the originators and may have been previously serviced by collection agencies. Semi-performing receivables are accounts where the debtor is currently making partial or irregular monthly payments, but the accounts may have been written-off by the originators. Performing receivables are accounts where the debtor is making regular monthly payments that may or may not have been delinquent in the past. Distressed consumer receivables are the unpaid debts of individuals to banks, finance companies and other credit providers. A large portion of our distressed consumer receivables are MasterCard ® , Visa ® and other credit card accounts which were charged-off by the issuers or providers for non-payment. We acquire these and other consumer receivable portfolios at substantial discounts to their face values. The discounts are based on the characteristics (issuer, account size, debtor location and age of debt) of the underlying accounts of each portfolio. Litigation related receivables are semi-performing investments whereby the Company is assigned the revenue stream from the proceeds received. The business conducts its activities primarily under the name Palisades Collection, LLC.

- *Personal injury claims* – Pegasus Funding, LLC , an 80% owned subsidiary, purchases interests in personal injury claims from claimants who are a party to personal injury litigation. Pegasus advances to each claimant funds on a non-recourse basis at an agreed upon interest rate, in anticipation of a future settlement. The interest in each claim purchased by Pegasus consists of the right to receive, from such claimant, part of the proceeds or recoveries which such claimant receives by reason of a settlement, judgment or award with respect to such claimant's claim.

- *Structured settlements* – On December 31, 2013, the Company purchased an 80% interest in CBC Settlement Funding, LLC. CBC purchases periodic structured settlements and annuity policies from individuals in exchange for a lump sum payment.

- *GAR Disability Advocates* is a non-attorney advocacy group, that represents individuals nationwide in their claims for social security disability and supplemental security income benefits from the Social Security Administration.

Certain non-allocated administrative costs, interest income, interest expense and various other non-operating income and expenses are reflected in Corporate. Corporate assets include cash and cash equivalents, available-for-sale securities, property and equipment, goodwill, deferred taxes, other investments and other assets.

30

**ASTA FUNDING, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**Note 20— Segment Reporting** *(continued)*

The following table shows results by reporting segment for the nine and three month periods ended June 30, 2015 and 2014 and total assets as of June 30, 2015 and September 30, 2014:

| (Dollars in millions) | Fiscal Year | Time Frame | Consumer Receivables | Personal Injury Claims | Structured Settlements | GAR Disability Advocates | Corporate | Total Company |
|---|---|---|---|---|---|---|---|---|
| Revenues | 2015 | 9 Months | $ 15.7 | $ 6.1 | $ 7.6 | $ 0.9 | $ — | $ 30.3 |
| | 2015 | Q3 | 5.2 | 1.7 | 2.6 | 0.5 | — | 10.0 |
| | 2014 | 9 Months | 14.8 | 5.7 | 2.9 | 0.3 | — | 23.7 |
| | 2014 | Q3 | 5.1 | 1.8 | 1.4 | 0.1 | — | 8.4 |
| Other income | 2015 | 9 Months | — | — | — | — | 1.2 | 1.2 |
| | 2015 | Q3 | — | — | — | — | 0.2 | 0.2 |
| | 2014 | 9 Months | 26.1 | — | — | — | 1.1 | 27.2 |
| | 2014 | Q3 | 26.1 | — | — | — | 0.2 | 26.3 |
| Income before income taxes | 2015 | 9 Months | 10.2 | (0.5) | 1.4 | (4.0) | (5.1) | 2.0 |
| | 2015 | Q3 | 3.2 | (0.3) | 0.5 | (1.4) | (1.6) | 0.4 |
| | 2014 | 9 Months | 15.6 | 2.5 | (0.2) | (1.8) | (6.1) | 10.0 |
| | 2014 | Q3 | 10.1 | 0.3 | (0.3) | (0.4) | (2.0) | 7.7 |
| Total assets | 2015 | June 30 | 19.9 | 38.2 | 54.8 | 2.5 | 118.3 | 233.7 |
| | 2014 | Sept 30 | 30.5 | 34.0 | 38.5 | 1.0 | 113.1 | 217.1 |
| Capital expenditures | 2015 | 9 Months | — | — | — | — | 0.1 | 0.1 |
| | 2015 | Q3 | — | — | — | — | 0.1 | 0.1 |
| | 2014 | 9 Months | — | — | — | — | — | — |
| | 2014 | Q3 | — | — | — | — | — | — |
| Depreciation | 2015 | 9 Months | — | — | — | — | 0.5 | 0.5 |
| | 2015 | Q3 | — | — | — | — | 0.2 | 0.2 |
| | 2014 | 9 Months | — | — | — | — | 0.5 | 0.5 |
| | 2014 | Q3 | — | — | — | — | 0.2 | 0.2 |

The Company does not have any intersegment revenue transactions.

**Note 21—Subsequent Events**

On July 16, 2015, the Company made a payment to the IRS of approximately $13.0 million in anticipation of the conclusion of the examination by the IRS and in accordance with their notice of proposed adjustment, for the fiscal tax years ended September 30, 2009 through September 30, 2013. The adjustment is the result of a change in the accounting method used for income recognition for income tax purposes. Apart from the change in accounting method for income tax purposes, there were no other material disallowances or adjustments to other items of income, deductions, and credits to the tax returns under examination. The payment does not include approximately $507,000 of interest related to the tax year of the IRS adjustment, September 30, 2013 which has been accrued for as of June 30, 2015. The Company will be amending its federal tax return for the fiscal year ended September 30, 2014, to reflect the new accounting method for income tax purposes. There is no state and local tax liability as a result of the Federal tax examination.

## Item 2.    Management's Discussion and Analysis of Financial Condition and Results of Operations

### Caution Regarding Forward Looking Statements

*This Quarterly Report on Form 10-Q contains certain forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21 E of the Securities Exchange Act of 1934. All statements other than statements of historical facts included or incorporated by reference in this quarterly report on Form 10-Q, including without limitation, statements regarding our future financial position, business strategy, budgets, projected revenues, projected costs and plans and objective of management for future operations, are forward-looking statements. Forward-looking statements generally can be identified by the use of forward-looking terminology such as "may," "will," "expects," "intends," "plans," "projects," "estimates," "anticipates," or "believes" or the negative thereof or any variation there on or similar terminology or expressions.*

*We have based these forward-looking statements on our current expectations and projections about future events. These forward-looking statements are not guarantees and are subject to known and unknown risks, uncertainties and assumptions about us that may cause our actual results, levels of activity, performance or achievements to be materially different from any future results, levels of activity, performance or achievements expressed or implied by such forward-looking statements. Important factors which could materially affect our results and our future performance include, without limitation, our ability to purchase defaulted consumer receivables at appropriate prices, changes in government regulations that affect our ability to collect sufficient amounts on our defaulted consumer receivables, our ability to employ and retain qualified employees, changes in the credit or capital markets, changes in interest rates, deterioration in economic conditions, negative press regarding the debt collection industry which may have a negative impact on a debtor's willingness to pay the debt we acquire, and statements of assumption underlying any of the foregoing, as well as other factors set forth under "Item 1A. Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended September 30, 2014 and Item 1A of this Quarterly Report on Form 10-Q.*

*All subsequent written and oral forward-looking statements attributable to us, or persons acting on our behalf, are expressly qualified in their entirety by the foregoing. Except as required by law, we assume no duty to update or revise any forward-looking statements.*

### Overview

Asta Funding, Inc., together with its wholly owned significant operating subsidiaries Palisades Collection LLC, Palisades Acquisition XVI, LLC ("Palisades XVI"), VATIV Recovery Solutions LLC ("VATIV"), ASFI Pegasus Holdings, LLC ("APH"), Fund Pegasus, LLC ("Fund Pegasus"), GAR Disability Advocates, LLC ("GAR Disability Advocates") and other subsidiaries, not all wholly owned (the "Company," "we" or "us"), has been engaged in the business of purchasing, managing for its own account and servicing distressed consumer receivables, including charged-off receivables and semi-performing receivables, since 1994. The primary charged –off receivables are accounts that have been written-off by the originators and may have been previously serviced by collection agencies. Semi-performing receivables are accounts where the debtor is currently making partial or irregular monthly payments, but the accounts may have been written-off by the originators. Distressed consumer receivables are the unpaid debts of individuals to banks, finance companies and other credit providers. A large portion of our distressed consumer receivables are MasterCard ®, Visa ® and other credit card accounts which were charged-off by the issuers or providers for non-payment. We acquire these and other consumer receivable portfolios at substantial discounts to their face values. The discounts are based on the characteristics (issuer, account size, debtor location and age of debt) of the underlying accounts of each portfolio. Litigation related receivables are semi-performing investments whereby the Company is assigned the revenue stream from the proceeds received. GAR Disability Advocates is a Social Security disability advocacy firm. GAR Disability Advocates assists claimants in obtaining long term disability benefits from the Social Security administration.

We own 80% of Pegasus Funding, LLC ("Pegasus"), which invests in funding personal injury claims and 80% of CBC Settlement Funding, LLC ("CBC"), which invests in structured settlements.

Pegasus provides funding for individuals in need of short term funds pending insurance settlements of their personal injury claims. The funds will be recouped when the underlying insurance settlements are paid. The long periods of time taken by insurance companies to settle and pay such claims resulting from lengthy litigation and the court process is fueling the demand for such funding.

CBC provides liquidity to consumers by purchasing certain deferred payment streams including, but not limited to, structured settlements and annuities. CBC generates business from direct marketing as well as through wholesale purchases from brokers or other third parties. CBC has its principal office in Conshohocken, Pennsylvania. CBC primarily warehouses the receivables it originates and periodically resells or securitizes those assets on a pooled basis. The structured settlement marketplace is regulated by federal and state law, requiring that each transaction is reviewed and approved by court order.

We operate principally in the United States in four reportable business segments.

32

**Financial Information about Operating Segments**

The Company operates through strategic business units that are aggregated into four reportable segments: Consumer receivables, personal injury claims, structured settlements and disability benefits. The four reportable segments consist of the following:

- *Consumer receivables* – This segment is engaged in the business of purchasing, managing for its own account and servicing distressed consumer receivables, including charged off and semi-performing receivables. The charged-off receivables are accounts that have been written-off by the originators and may have been previously serviced by collection agencies. Semi-performing receivables are accounts where the debtor is currently making partial or irregular monthly payments, but the accounts may have been written-off by the originators. Distressed consumer receivables are the unpaid debts of individuals to banks, finance companies and other credit providers. A large portion of our distressed consumer receivables are MasterCard ® , Visa ® and other credit card accounts which were charged-off by the issuers or providers for non-payment. These receivables were acquired at substantial discounts to their face values. The discounts are based on the characteristics (issuer, account size, debtor location and age of debt) of the underlying accounts of each portfolio. Litigation related receivables are semi-performing investments whereby the Company is assigned the revenue stream from the proceeds received. The business conducts its activities primarily under the name Palisades Collection, LLC.

- *Personal injury claims* – Pegasus Funding, LLC , an 80% owned subsidiary, purchases interests in personal injury claims from claimants who are a party to personal injury litigation. Pegasus advances to each claimant funds on a non-recourse basis at an agreed upon interest rate, in anticipation of a future settlement. The interest in each claim purchased by Pegasus consists of the right to receive, from such claimant, part of the proceeds or recoveries which such claimant receives by reason of a settlement, judgment or award with respect to such claimant's claim.

- *Structured settlements* . On December 31, 2013 the Company purchased an 80% interest in CBC Settlement Funding, LLC. CBC purchases periodic structured settlements and annuity policies from individuals in exchange for a lump sum payment.

- *GAR Disability Advocates* is Social Security disability advocacy group, which obtains and represents individuals in their claims for social security disability and supplemental security income benefits from the Social Security Administration.

Three of the Company's business lines accounted for 10% or more of consolidated net revenue for the three and nine month periods ended June 30, 2015 and for the three month period ended June 30, 2014. For the nine month period ended June 30, 2014, three of the Company's business lines accounted for 10% or more of the consolidated net revenue. The following table summarizes the net revenues by percentage from the four lines of business for the three and nine month periods ended June 30, 2015 and 2014:

|  | Three Month Periods Ended June 30, | | Nine Month Periods Ended June 30, | |
|  | 2015 | 2014 | 2015 | 2014 |
|---|---|---|---|---|
| Finance income (consumer receivables) | 51.4% | 60.4% | 51.9% | 62.4% |
| Personal injury claims | 17.2% | 21.2% | 20.1% | 24.1% |
| Structured settlements | 25.9% | 16.8% | 25.0% | 12.4% |
| GAR Disability Advocates | 5.5% | 1.6% | 3.0% | 1.1% |
| Total revenues | 100.0% | 100.0% | 100.0% | 100.0% |

The Company has no reportable segment information from international operations.

Information about the results of each of the Company's reportable segments for the three and nine month periods ended June 30, 2015 and 2014 and total assets as of June 30, 2015 and September 30, 2014, reconciled to the consolidated results, is set forth below. For additional information, refer to the information set forth under the caption "Segment Results from Continuing Operations" in "Management's Discussion and Analysis of Financial Condition and Results of Operations," below.

| (Dollars in millions) | Fiscal Year | Time Frame | Consumer Receivables | Personal Injury Claims | Structured Settlements | GAR Disability Advocates | Corporate | Total Company |
|---|---|---|---|---|---|---|---|---|
| Revenues | 2015 | 9 months | $ 15.7 | $ 6.1 | $ 7.6 | $ 0.9 | $ — | $ 30.3 |
|  | 2015 | Q3 | 5.2 | 1.7 | 2.6 | 0.5 | — | 10.0 |
|  | 2014 | 9 months | 14.8 | 5.7 | 2.9 | 0.3 | — | 23.7 |
|  | 2014 | Q3 | 5.1 | 1.8 | 1.4 | 0.1 | — | 8.4 |
| Other income | 2015 | 9 months | — | — | — | — | 1.2 | 1.2 |
|  | 2015 | Q3 | — | — | — | — | 0.2 | 0.2 |
|  | 2014 | 9 months | 26.1 | — | — | — | 1.1 | 27.2 |
|  | 2014 | Q3 | 26.1 | — | — | — | 0.2 | 26.3 |
| Income before income taxes | 2015 | 9 months | 10.2 | (0.5) | 1.4 | (4.0) | (5.1) | 2.0 |
|  | 2015 | Q3 | 3.2 | (0.3) | 0.5 | (1.4) | (1.6) | 0.4 |
|  | 2014 | 9 months | 15.6 | 2.5 | (0.2) | (1.8) | (6.1) | 10.0 |
|  | 2014 | Q3 | 10.1 | 0.3 | (0.3) | (0.4) | (2.0) | 7.7 |
| Total assets | 2015 | June 30 | 19.9 | 38.2 | 54.8 | 2.5 | 118.3 | 233.7 |
|  | 2014 | Sep 30 | 30.5 | 34.0 | 38.5 | 1.0 | 113.1 | 217.1 |

*Litigation Funding Business*

On December 28, 2011, the Company purchased an 80% interest in Pegasus. Pegasus Legal Funding ("PLF") holds the other 20% interest. The Company is committed to loan up to $21.8 million per year to Pegasus for a term of five years, all of which is secured by the assets of Pegasus. These loans will provide financing for the personal injury litigation claims and operating expenses of Pegasus.

Pegasus is actively managed by personal injury litigation funders, Max Alperovich and Alexander Khanas, who rely upon strict underwriting criteria to provide legal funding to personal injury plaintiffs prior to the settlement of their claims or their resolution in court. The Pegasus business model entails the outlay of non-recourse advances to a plaintiff with an agreed-upon fee structure to be repaid from the plaintiff's recovery. Typically, such advances to a plaintiff approximate 10-20% of the anticipated recovery. These funds are generally used by the plaintiff for a variety of urgent necessities, ranging from surgical procedures to everyday living expenses.

Pegasus's profits and losses will be distributed at 80% to the Company and 20% to PLF. These distributions will be made only after the repayment of Fund Pegasus' principal amount loaned, plus an amount equal to advances for overhead expenses. As of June 30, 2015, the Company's net investment in personal injury cases was approximately $37.2 million.

On May 18, 2012, BP Case Management, LLC ("Balance Point") was formed, a joint venture (the "Venture") with California-based Balance Point Divorce Funding, LLC ("Balance Point Management"). The Venture provides non-recourse funding to a spouse in a matrimonial action where the marital assets exceed $2,000,000. Such funds can be used for legal fees, expert costs and necessary living expenses. The Venture receives an agreed percentage of the proceeds received by such spouse upon final resolution of the case. Balance Point's profits and losses are distributed 60% to us and 40% to Balance Point Management, after the return of our investment on a case by case basis and after a 15% preferred return to us. Our initial investment in the Venture consisted of up to $15 million to fund divorce claims to be fulfilled in three tranches of $5 million each. Each investment tranche is contingent upon a minimum 15% cash-on-cash return to us. At our option, there could be an additional $35 million investment in divorce claims in tranches of $10 million, $10 million, and $15 million, also with a 15% preferred return and such investments may even exceed a total of $50 million, at our sole option. Should the preferred return be less than 15% on any $5 million tranche, the 60%/40% profit and loss split would be adjusted to reflect our priority to a 15% preferred return. As of June 30, 2015, we have invested $2.5 million in cases managed by this Venture.

We provided a $1.0 million revolving line of credit to partially fund Balance Point Management's operations with such loan bearing interest at the prevailing prime rate, with an initial term of twenty-four months, which may be extended under certain circumstances for an additional 24 month period. The revolving line of credit is collateralized by Balance Point Management's profits share in the Venture and other assets. At June 30, 2015, the balance on the revolving line of credit was approximately $1.5 million. The term of the loan was to end in May 2014, but was extended. In September 2014, the agreement was revised to extend the term of the loan to August 2016, increase the credit line to $1.5 million and include a personal guarantee of the principal of Balance Point Management.

*Structured Settlement Business*

On December 31, 2014, the Company acquired 80% ownership of CBC and its affiliate, CBC Management Services, LLC for approximately $5.9 million. In addition, the Company will provide financing to CBC of up to $5 million.

CBC purchases periodic payments under structured settlements and annuity policies from individuals in exchange for a lump sum payment. The operating principals of CBC, William J. Skyrm, Esq. and James Goodman, have over 30 years combined experience in the structured settlement industry.

CBC has a portfolio of structured settlements which is financed by approximately $46.7 million of debt, including a $14.4 million line of credit from an institutional source and notes issued by CBC to third party investors.

**Critical Accounting Policies**

We may account for our investments in consumer receivable portfolios, using either:

•      the interest method; or

•      the cost recovery method.

As we believe our extensive liquidating experience in certain asset classes such as distressed credit card receivables, telecommunication receivables, consumer loan receivables and mixed consumer receivables has matured, we have used the interest method when we believe we can reasonably estimate the timing of the cash flows. In those situations where we diversify our acquisitions into other asset classes and we do not possess the same expertise, or we cannot reasonably estimate the timing of the cash flows, we have utilized the cost recovery method of accounting for those portfolios of receivables.

The Company can account for certain of its investments in finance receivables using the interest method under the guidance of FASB Accounting Standards Codification ("ASC"), Receivables — Loans and Debt Securities Acquired with Deteriorated Credit Quality, ("ASC 310-30"). Under the guidance of ASC 310-30, static pools of accounts are established. These pools are aggregated based on certain common risk criteria. Each static pool is recorded at cost and is accounted for as a single unit for the recognition of income, principal payments and loss provision. Effective October 1, 2013, due to the substantial reduction of portfolios reported under the interest method, and the ability to reasonably estimate cash collections required to account for those portfolios under the interest method the Company concluded the cost recovery method is the appropriate accounting method under the circumstances.

Despite all of the Company's portfolios being on the cost recovery method, the Company must still analyze a portfolio upon acquisition and once a static pool is established for a quarter, individual receivable accounts are not added to the pool (unless replaced by the seller) or removed from the pool (unless sold or returned to the seller).

Under the interest method, ASC 310-30 requires that the excess of the contractual cash flows over expected cash flows not be recognized as an adjustment of revenue or expense or on the balance sheet. ASC 310-30 initially freezes the internal rate of return, referred to as IRR, estimated when the accounts receivable are purchased, as the basis for subsequent impairment testing. Significant increases in actual or expected future cash flows may be recognized prospectively through an upward adjustment of the IRR over a portfolio's remaining life. Any increase to the IRR then becomes the new benchmark for impairment testing. Rather than lowering the estimated IRR if the collection estimates are not received or projected to be received, the carrying value of a pool would be impaired, or written down to maintain the then current IRR. Under the interest method, income is recognized on the effective yield method based on the actual cash collected during a period and future estimated cash flows and timing of such collections and the portfolio's cost. Material variations of cash flow estimates are recorded in the quarter such variations are determined. The estimated future cash flows are reevaluated quarterly.

The Company uses the cost recovery method when collections on a particular pool of accounts cannot be reasonably predicted. Under the cost recovery method, no income is recognized until the cost of the portfolio has been fully recovered. A pool can become fully amortized (zero carrying balance on the balance sheet) while still generating cash collections. In this case, all cash collections are recognized as revenue when received.

The Company's extensive liquidating experience is in the field of distressed credit card receivables, telecommunication receivables, consumer loan receivables, retail installment contracts, consumer receivables, and auto deficiency receivables. The Company will analyze a portfolio to determine if the interest method is appropriate for accounting for asset acquisitions within these classes of receivables when it believes it can reasonably estimate the timing of the cash flows. In those situations where the Company diversifies its acquisitions into other asset classes and the Company does not possess the same expertise, or the Company cannot reasonably estimate the timing of the cash flows with an appropriate degree of precision, the Company utilizes the cost recovery method of accounting for those portfolios of receivables. At June 30, 2015, all of the portfolios are accounted for on the cost recovery method, of which $12.5 million is concentrated in one portfolio, the remaining value of a $300 million portfolio purchase in March 2007 (the "Portfolio Purchase").

We may consider for aggregation portfolios of accounts, purchased within the same fiscal quarter, that generally have the following characteristics:

- same issuer/originator

- same underlying credit quality

- similar geographic distribution of the accounts

- similar age of the receivable and

- same type of asset class (credit cards, telecommunications, etc.)

After determining that an investment will yield an adequate return on our acquisition cost after servicing fees, including court costs which are expensed as incurred, we use a variety of qualitative and quantitative factors to determine the estimated cash flows. As previously mentioned, included in our analysis for purchasing a portfolio of receivables and determining a reasonable estimate of collections and the timing thereof, the following variables are analyzed and factored into our original estimates:

- the number of collection agencies previously attempting to collect the receivables in the portfolio;

- the average balance of the receivables;

- the age of the receivables (as older receivables might be more difficult to collect or might be less cost effective);

- past history of performance of similar assets — as we purchase portfolios of similar assets, we believe we have built significant history on how these receivables will liquidate and cash flow;

- number of months since charge-off;

- payments made since charge-off;

- the credit originator and their credit guidelines;

- the locations of the debtors as there are better states to attempt to collect in and ultimately we have better predictability of the liquidations and the expected cash flows. Conversely, there are also states where the liquidation rates are not as good and that is factored into our cash flow analysis;

- financial wherewithal of the seller;

- jobs or property of the debtors found within portfolios-with our business model, this is of particular importance as debtors with jobs or property are more likely to repay their obligation and conversely, debtors without jobs or property are less likely to repay their obligation ; and

- the ability to obtain customer statements from the original issuer.

We will obtain and utilize as appropriate input including, but not limited to, monthly collection projections and liquidation rates, from our third party collection agencies and attorneys, as further evidentiary matter, to assist us in developing collection strategies and in modeling the expected cash flows for a given portfolio.

We acquire accounts that have experienced deterioration of credit quality between origination and the date of our acquisition of the accounts. The amount paid for a portfolio of accounts reflects our determination that it is probable we will be unable to collect all amounts due according to the portfolio of accounts' contractual terms. We consider the expected payments and estimate the amount and timing of undiscounted expected principal, interest and other cash flows for each acquired portfolio coupled with expected cash flows from accounts available for sales. The excess of this amount over the cost of the portfolio, representing the excess of the accounts' cash flows expected to be collected over the amount paid, is accreted into income recognized on finance receivables over the expected remaining life of the portfolio.

Table of Contents

We believe we have significant experience in acquiring certain distressed consumer receivable portfolios at a significant discount to the amount actually owed by underlying debtors. We acquire these portfolios only after both qualitative and quantitative analyses of the underlying receivables are performed and a calculated purchase price is paid so that we believe our estimated cash flow offers us an adequate return on our costs, including servicing expenses. Additionally, when considering portfolio purchases of accounts, or portfolios from issuers from whom we have little or limited experience, we have the added benefit of soliciting our third party collection agencies and attorneys for their input on liquidation rates and, at times, incorporate such input into the price we offer for a given portfolio and the estimates we use for our expected cash flows.

We account for our investment in personal injury claims at an agreed upon interest rate, in anticipation of a future settlement. The interest purchased by Pegasus in each claim consists of the right to receive from such claimant part of the proceeds or recoveries which such claimant receives by reason of a settlement, judgment or award with respect to such claimant's claim. Open case revenue is estimated, recognized and accrued at a rate based on the expected realization and underwriting guidelines and facts and circumstances for each individual case. These personal injury claims are non-recourse. The reserve for bad debts is recorded based upon the historical trend for write off in the personal injury financing industry, the aging of the claims and other factors that could impact recoverability.

When a case is closed and cash is received for the advance provided to a claimant, revenue is recognized based upon the contractually agreed upon interest rate, and, if applicable, adjusted for any changes due to a settled amount and fees charged to a claimant.

The funding of BPCM matrimonial actions is on a non- recourse basis. BPCM revenues are recognized under the cost recovery method.

CBC purchases periodic payments under structured settlements and annuity policies from individuals in exchange for a lump sum payment. The Company elected to carry the structured settlements at fair value. Unearned income on structured settlements is recognized as interest income using the effective interest method over the life of the related structured settlement. Changes in fair value are recorded in unrealized gain (loss) in structured settlements in our statements of income.

In the following discussions, most percentages and dollar amounts have been rounded to aid presentation. As a result, all figures are approximations.

### Results of Operations

**The nine-month period ended June 30, 2015, compared to the nine-month period ended June 30, 2014**

*Finance income* . For the nine month period ended June 30, 2015, finance income increased $0.9 million, or 6.1%, to $15.7 million from $14.8 million for the nine month period ended June 30, 2014. Finance income increased due to increased zero based income. We purchased $28.0 million in face value of new portfolios at a cost of $2.0 million in the first nine months of fiscal year 2015 as compared to $53.0 million in face value of new portfolios at a cost of $3.7 million for the comparable fiscal year 2014 period. The portfolios purchased are accounted for on the cost recovery method. During the first nine months of fiscal year 2015, gross collections decreased 15.8% to $43.7 million from $51.9 million for the nine months ended June 30, 2014, reflecting the lower level of purchases, and the age of our portfolios. Commissions and fees associated with gross collections from our third party collection agencies and attorneys decreased $5.7 million, or 27.0%, for the nine months ended June 30, 2015 as compared to the same period in the prior year, and averaged 35.3% of collections for the nine months ended June 30, 2015 as compared to 40.7% for the same prior year period, reflecting lower commission rates on collections attributable to our fiscal year 2015 portfolio purchases. Net collections decreased 7.8% to $28.3 million from $30.7 million for the nine months ended June 30, 2014.

*Other income.* The following table summarizes other income for the nine month periods ended June 30, 2015 and 2014:

|  | June 30, | |
|  | 2015 | 2014 |
|---|---|---|
| Interest and dividend income | $ 789,000 | $1,023,000 |
| Realized gain | 114,000 | 45,000 |
| Other | 313,000 | 49,000 |
|  | $1,216,000 | $1,117,000 |

Other income consists of interest and dividend income, realized gains and losses on available for sale transactions, and other service fee income. Other income also includes $0.3 million in unrealized gain associated with the investment in the Topaz MP Fixed Income Fund ("Topaz").

*Personal injury claims income* . For the nine month period ended June 30, 2015, personal injury claims income increased 7.0% to $6.1 million, from $5.7 million for the nine month period ended June 30, 2014, as investment in personal injury claims in fiscal years 2012 through 2014 translated into more closed cases in the fiscal year 2015 period than in the fiscal year 2014 period.

*Structured settlement income* . Structured settlement income was $7.6 million in the nine month period ended June 30, 2015, consisting of interest income on structured settlements, $3.3 million, and unrealized gain on structured settlements, $4.3 million, compared to $2.9 million in the nine month period ended June 30, 2014, consisting of interest income on structured settlements, $1.5 million, and unrealized gain on structured settlements, $1.4 million. The increase in structured settlement income reflects Nine Months of results in the current year period compared to two quarters of results in the prior year period.

*Disability fee income* – increased $0.6 million to $0.9 million in the current nine month period from $0.3 million in the nine month period ended June 30, 2014, as new programs initiated in the prior fiscal year have translated into increased revenues in the current fiscal year.

*Forgiveness of non-recourse debt* . On June 3, 2014 the Company made the final payment of the remaining amount due on the non-recourse debt due to the Bank of Montreal in accordance with the Settlement Agreement signed in August 2013. The Company has recorded as other income, forgiveness of non-recourse debt, in the amount of approximately $26.1 million in the third quarter of fiscal year 2014.

*General and administrative expenses* . During the nine months ended June 30, 2015, general and administrative expenses increased $7.3 million, or 35.5%, to $27.8 million from $20.5 million for the Nine Months ended June 30, 2014. The increase reflects the inclusion of nine months of results attributable to CBC for fiscal year 2015 compared to six months of fiscal year 2014. Additionally, there has been an increase in advertising programs of approximately $1.0 million and staffing levels of $0.7 million that have contributed to the growth of the structured settlement business. Also contributing to the increase is an increase in the bad debt expense of approximately $2.0 million of the Pegasus Funding personal injury unit. In addition, as we grow the disability unit, GAR Disability Advocates, there has been a $1.3 million increase in staffing costs and another $1.3 million in programs designed to grow the case level. It takes approximately 12 to 18 months, and, in some cases, longer, to collect the fees associated with these disability cases. Also, there was a $0.9 million unrealized exchange rate loss associated with the investment in Topaz, which is denominated in Euros.

Table of Contents

*Interest expense.* During the nine month period ended June 30, 2015, interest expense increased $0.9 million, to $1.7 million from $0.8 million in the same prior year period. The increase reflects the inclusion of nine months of CBC interest expense in the current period, as compared to six months of CBC interest expense in the prior year, in addition to the increased level of borrowings over the prior year.

*Impairments –* There were no impairments in the nine month period ended June 30, 2015 as compared to $19.6 million recorded during the nine month period ended June 30, 2014. The $19.6 million of impairments in the nine month period ended June 30, 2014 was comprised of $14.0 million for the Great Seneca Portfolio, $4.7 million for the medical receivables portfolio and $0.9 million for other portfolios. The Great Seneca portfolio was purchased in March 2007. The portfolio was purchased on the secondary market and as such accounts included in the portfolio were 5 to 6 years old at the time of purchase. Purchasing portfolios on the secondary market was not a normal course of action for us at the time, as we primarily purchased accounts from the originator of the accounts. This action of purchasing from the secondary market played a role in the determination in March 2008 that we could no longer reasonably forecast cash collections and therefore switched the portfolio to the cost recovery method. Based upon the age of the Great Seneca portfolio in June 2014 (over seven years from our purchase date, and 12 to 13 years from the inception of the portfolio) the portfolio was clearly on the outer bounds of our collection forecasts. Based upon the significantly reduced collection forecast and the lower valuation of the judgments as they age, we determined an impairment of $14 million was necessary in June 2014.

The medical receivables were related to a market that we are no longer in. We exited the market in terms of financing such receivables in 2012 and impaired the portfolio and switched to the cost recovery method at that time. The collections continued to deteriorate and fell short of expectations by a significant margin and, therefore, we impaired the remaining value of the portfolio of $4.7 million in June 2014.

*Net income before taxes – Consumer Receivables* . Net income before taxes for the nine months ended June 30, 2015 decreased $5.9 million from $15.6 million in fiscal year 2014 to $9.7 million for the nine months ended June 30, 2015, due to lower consumer receivables collections, and debt forgiveness of $26.1 million in the prior year period, partially offset by $19.6 million in impairments in the prior year.

*Net (loss) / income before taxes – Personal Injury Claim* . Net loss before taxes was $0.5 million for the nine month period ended June 30, 2015 compare to net income before taxes of $2.5 million for the nine month period ended June 30, 2014. The variance is related to a $2.0 million increase in bad debt expense.

*Net income / (loss) before taxes – Structured Settlements* . Net income before taxes was $1.4 million in the nine month period ended June 30, 2015 compared to a $0.2 million loss in the nine month period ended June 30, 2014, as the growth in the CBC unit yielding more structured settlement agreements in the current nine month period. The structured settlement segment included only six months of activity during fiscal year 2014. Also, subsequent to the acquisition during fiscal year 2014, the cost of the initial phase of the advertising campaign was included in the period results. The results of the program yielded the revenue growth we have experienced in fiscal year 2015.

*Net loss before taxes – Disability fee income* . Net loss before taxes was $4.0 million in the nine month period ended June 30, 2015 fiscal year 2015 period as compared to a net loss before taxes of $1.8 million in the same prior year period. GAR Disability Advocates is building the business through increased costs in staffing (approximately $1.3 million) and programs designed to acquire cases (approximately $1.3 million) . Through these programs, fee income increased $0.6 million in fiscal year 2015 as compared to the same prior year period.

*Income tax expense.* Income tax expense, consisting of federal and state income taxes, was $0.9 million for the nine months ended June 30, 2015, as compared to income tax expense of $3.8 million for the comparable 2014 period.

*Income attributable to non-controlling interest.* The income attributable to non-controlling 20% interests in Pegasus and CBC of $193,000 was recorded in the nine month period ended June 30, 2015, as compared to $483,000 in the nine month period ended June 30, 2014. The decrease is attributable to the lower income results posted by Pegasus as there was an increase in the reserve for bad debts.

*Net income attributable to Asta Funding, Inc.* For the nine months ended June 30, 2015, net income was $0.9 million, as compared to net income of $5.7 million for the nine month period ended June 30, 2014, primarily resulting from $26.1 million in prior period debt forgiveness, partially offset by $19.6 million in prior period impairments.

40

Table of Contents

**The three-month period ended June 30, 2015, compared to the three-month period ended June 30, 2014**

*Finance income.* For the three month period ended June 30, 2015, finance income was $5.2 million as compared to $5.1 million for the three month period ended June 30, 2014, an increase of $0.1 million, or 1.6%. We purchased $3.6 million in face value of new portfolios at a cost of $0.4 million in the third quarter of fiscal year 2015, as compared to $35.9 million in face value of new portfolios at a cost of $2.7 million in the third quarter of fiscal year 2014. The portfolios acquired are accounted for under the cost recovery method. During the third quarter of fiscal year 2015, gross collections decreased 23.5% to $14.0 million from $18.2 million for the three months ended June 30, 2014. Commissions and fees associated with gross collections from our third party collection agencies and attorneys decreased $3.1 million, or 37.7%, for the three months ended June 30, 2015 as compared to the same period in the prior year, and averaged 36.5% of collections during the three month period ended June 30, 2015 compared to 44.8% during the same prior year period, reflecting lower commission rates on collections attributable to our fiscal year 2015 portfolio purchases. Net collections decreased 12.0% to $8.8 million in the current quarter from $10.0 million for the three months ended June 30, 2014.

*Other income.* The following table summarizes other income for the three month periods ended June 30, 2015 and 2014:

| | June 30, | |
| --- | --- | --- |
| | 2015 | 2014 |
| Interest and dividend income | $ 375,000 | $ 336,000 |
| Realized (loss) | (159,000) | (116,000) |
| Other | (31,000) | (21,000) |
| | $ 185,000 | $ 199,000 |

Other income consists of interest and dividend income, realized gains and losses on available for sale transactions, and other service fee income. Other income also includes $0.3 million in unrealized gain associated with the investment in Topaz .

*Personal injury claims income* . For the three month period ended June 30, 2015, personal injury claims income decreased $0.1 million to $1.7 million from $1.8 million for the three month period ended June 30, 2014.

*Structured settlement income* . Structured settlement income was $2.6 million in the three month period ended June 30, 2015, consisting of interest income on structured settlements, $1.4 million, and unrealized gain on structured settlements, $1.2 million. Structured settlement income was $1.4 million in the three month period ended June 30, 2014, consisting of interest income on structured settlements, $0.8 million and unrealized gain on structured settlements, $0.6 million. The increase in primarily due to the growth of the number of structured settlements cases closed over the prior year.

*Disability fee income* – Disability fee income increased $0.4 million to $0.5 million in the current nine month period from $0.1 million in the three month period ended June 30, 2014, as new programs initiated in the prior fiscal year have translated into increased revenues in the current three month period.

*Forgiveness of non-recourse debt* . On June 3, 2014 the Company made the final payment of the remaining amount due on the non-recourse debt due to the Bank of Montreal in accordance with the Settlement Agreement signed in August 2013. The Company has recorded as other income, forgiveness of non-recourse debt, in the amount of approximately $26.1 million in the third quarter of fiscal year 2014.

*General and administrative expenses* . During the three-month period ended June 30, 2015, general and administrative expenses increased $2.2 million, or 30.9%, to $9.2 million from $7.0 million for the three months ended June 30, 2014. GAR Disability Advocates has experienced an increase in staffing and programs designed to grow the case level. It takes approximately 12 to 18 months, and in some cases longer to collect the fees associated with these disability cases. Additionally, there has been a growth of the CBC segment for fiscal year 2015 compared to three month period ended June 30, 2014, reflected in increases in staffing levels that have contributed to the growth of the structured settlement business.

*Interest expense.* During the three-month period ended June 30, 2015, interest expense was $0.6 million, compared to $0.4 million in the same period in the prior year. The increase in interest expense is the result of the growth of the CBC unit.

*Impairments* – There were no impairments in the three month period ended June 30, 2015 as compared to $19.6 million recorded during the three month period ended June 30, 2014. The $19.6 million of impairments in the three month period ended June 30, 2014 was comprised of $14.0 million for the Great Seneca Portfolio, $4.7 million for the medical receivables portfolio and $0.9 million for other portfolios. The Great Seneca Portfolio was purchased in March 2007. The portfolio was purchased on the secondary market and as such accounts included in the portfolio were 5 to 6 years old at the time of purchase. Purchasing portfolios on the secondary market was not a normal course of action for us at the time, as we primarily purchased accounts from the originator of the accounts. This action of purchasing from the secondary market played a role in the determination in March 2008 that we could no longer reasonably forecast cash collections and therefore switched the portfolio to the cost recovery method. Based upon the age of the Great Seneca portfolio in June 2014 (over seven years from our purchase date, and 12 to 13 years from the inception of the portfolio) the portfolio was clearly on the outer bounds of our collection forecasts. Based upon the significantly reduced collection forecast and the lower valuation of the judgments as they age, we determined an impairment of $14 million was necessary in June 2014.

The medical receivables were related to a market that we are no longer in. We exited the market in terms of financing such receivables in 2012 and impaired the portfolio and switched to the cost recovery method at that time. The collections continued to deteriorate and fell short of expectations by a significant margin and, therefore, we impaired the remaining value of the portfolio of $4.7 million in June 2014.

*Net income before taxes – Consumer Receivables.* Net income before taxes for the three months ended June 30, 2015 decreased $2.7 million from $9.8 million for the three months ended June 30, 2014 , primarily due to lower consumer receivables collections.

*Net income before taxes – Personal Injury Claims.* Net income before taxes decreased to $ zero in the current fiscal year period from $0.3 million in the fiscal year 2014 period.

*Net loss before taxes – Disability fee income* . Net loss before taxes increased to $1.4 million in the current fiscal year period from $0.4 million loss in the fiscal year 2014 period. The increase in net loss is due to the growth of the unit, including expenditures to secure disability cases, and increase in staffing levels.

*Income tax expense.* Income tax expense was $0.2 million and $3.0 million expense for the three month periods ended June 30, 2015 and June 30, 2014, respectively.

*Income attributable to non-controlling interest.* The income attributable to non-controlling interest was $92,000 and $20,000 in fiscal years 2015 and 2014, respectively.

*Net income attributable to Asta Funding, Inc.* Net income was $0.2 million for the three month period ended June 30, 2015 as compared to net income of $4.7 million for the three month period ended June 30, 2014. The decrease is primarily the result of a non-recurring $26.1 million forgiveness of debt in the prior year period, partially offset by a $19.6 million decrease in impairments in the current year period.

The following tables detail non-controlling interest for the nine month and three month period ended June 30, 2015:

| | For the Nine Months Ended June 30, 2015 | | |
|---|---|---|---|
| | Pegasus Funding LLC | CBC Settlement Funding, LLC | Total Non-Controlling Interests |
| Balance, beginning of period | $    (783,000) | $      70,000 | $      (713,000) |
| Non-controlling interest | (93,000) | 286,000 | 193,000 |
| Distributions | (754,000) | — | (754,000) |
| Balance, end of period | $(1,630,000) | $   356,000 | $   (1,274,000) |

| | For the Three Months Ended June 30, 2015 | | |
|---|---|---|---|
| | Pegasus Funding LLC | CBC Settlement Funding, LLC | Total Non-Controlling Interests |
| Balance, beginning of period | $(1,326,000) | $   248,000 | $   (1,078,000) |
| Non-controlling interest | (16,000) | 108,000 | 92,000 |
| Distributions | (288,000) | — | (288,000) |
| Balance, end of period | $(1,630,000) | $   356,000 | $   (1,274,000) |

The non-controlling interests are related to Pegasus and CBC. The distribution to non-controlling interest is the distributions made to the 20% non-controlling interest owners of Pegasus Funding, LLC ("Pegasus Funding"). The distribution, based upon the profitability of the closed personal injury cases using the formula included in the operating agreement signed December 28, 2011, as revised, are calculated with a 20% deduction for overhead expenses of the Pegasus Funding operation unit and a 20% write off of the personal injury cases deemed to be lost. The 20% write off amount is deducted directly from the distribution amount. No distributions have been made to CBC Settlement Funding, LLC ("CBC").

**Liquidity and Capital Resources**

Our primary sources of cash from operations include collections on the receivable portfolios that we have acquired and the funds generated from the Pegasus and CBC business segments. Our primary uses of cash include repayments of debt, our purchases of consumer receivable portfolios, interest payments, costs involved in the collections of consumer receivables, taxes and dividends, if approved. In the past, we relied significantly upon our lenders to provide the funds necessary for the purchase of consumer receivables acquired for liquidation.

*Receivables Financing Agreement ("RFA")*

In March 2007, Palisades XVI borrowed approximately $227 million under the RFA. As amended in July 2007, December 2007, May 2008, February 2009, October 2010 and August 2013 from BMO, in order to finance the Portfolio Purchase which had a purchase price of $300 million. The original term of the agreement was three years. This term was extended by in August 2013, discussed below.

Since the inception of the RFA, amendments have been signed to revise various terms of the Receivables Financing Agreement. Currently, the Settlement Agreement and Omnibus Amendment ("Settlement Agreement") is in effect on August 7, 2013, Palisades XVI, a 100% owned bankruptcy remote subsidiary, entered into the Settlement Agreement with BMO as an amendment to the RFA. In consideration for a $15 million prepayment funded by the Company, BMO agreed to significantly reduce minimum monthly collection requirements and the interest rate. If and when BMO were to receive the next $15 million of collections from the Portfolio Purchase, (the "Remaining Amount"), less certain credits for payments made prior to the consummation of the Settlement Agreement, the Company would be entitled to recover from future net collections the $15 million prepayment that it funded. Thereafter, BMO would have the right to receive 30% of future net collections. Upon repayment of the Remaining Amount to BMO, the Company would be released from the remaining contractual obligation of the RFA and the Settlement Agreement.

On June 3, 2014, Palisades XVI finished paying the Remaining Amount. The final principal payment of $2.9 million included a voluntary prepayment of $1.9 million provided from funds of the Company. Accordingly, Palisades XVI will be entitled to receive $16.9 million of future collections from the Portfolio Purchase before BMO is entitled to receive any payments with respect to its Income Interest. The Company estimates the Income Interest to be between $0 and $1.4 million. However, the Company believes that no amount will be incurred because of the continued deterioration of the collections from the portfolio purchase.

With the payment of the Remaining Amount and upon completion of the documents granting the Palisades XVI Income Interest, including a written confirmation from BMO that the obligation was paid in full, Palisades XVI was released from further debt obligations from the RFA.

*Bank Hapoalim B.M. ("Bank Hapoalim") Line of Credit*

On May 2, 2014, the Company obtained a $20 million line of credit facility from Bank Hapoalim, pursuant to a Loan Agreement (the "Loan Agreement") among the Company and its subsidiary, Palisades Collection, LLC, as borrowers, and Bank Hapoalim, as agent and lender. The Loan Agreement provides for a $20.0 million committed line of credit and an accordion feature providing an increase in the line of credit of up to $30 million, at the discretion of the lenders. The facility is for a term of three years at an interest rate of either LIBOR plus 275 basis points or prime, at the Company's option. The Loan Agreement includes covenants that require the Company to maintain a minimum net worth of $150 million and pay an unused line fee. The facility is secured pursuant to a Security Agreement ("Security Agreement") among the parties to the Loan Agreement. As of June 30, 2015, the Company had not used this facility.

*Other Investments – Personal Injury Claims*

On December 28, 2011, we formed a joint venture Pegasus Funding, LLC ("Pegasus") with Pegasus Legal Funding, LLC ("PLF"). Pegasus purchases interests in personal injury claims from claimants who are a party to a personal injury litigation with the expectation of a settlement in the future. Pegasus advances to each claimant funds on a non-recourse basis at an agreed upon interest rate in anticipation of a future settlement. The interest purchased by Pegasus in each claim will consist of the right to receive from such claimant part of the proceeds or recoveries which such claimant receives by reason of a settlement, judgment or award with respect to such claimant's claim. The profits from the joint venture are distributed based on the ownership percentage of the parties – Asta Funding, Inc. 80% and PLF, 20%.

*Other Investments – Divorce Funding*

On May 18, 2012, we formed BP Case Management, LLC ("BPCM"), a joint venture with California-based Balance Point Divorce Funding, LLC ("BP Divorce Funding"). BPCM provides non-recourse funding to a spouse in a matrimonial action. The Company provides a $1.0 million revolving line of credit to partially fund BP Divorce Funding's operations, with such loan bearing interest at the prevailing prime rate, with an initial term of twenty-four months. In September 2014, the agreement was revised to extend the term of the loan to August 2016, increase the line to $1.5 million and include a personal guarantee of the principal of BP Divorce Funding. The revolving line of credit is collateralized by BP Divorce Funding's profit share in BPCM and other assets.

*Other Investments – Structured Settlements*

On December 31, 2013, the Company acquired 80% ownership of CBC and its affiliate, CBC Management Services, LLC for approximately $5.9 million. At the closing, the operating principals of CBC, William J. Skyrm, Esq. and James Goodman, were each issued a 10% interest in CBC. In addition, the Company has agreed to provide financing to CBC of up to $5 million. Through the transaction we acquired structured settlements valued at $30.4 million and debt that totaled $23.4 million consisting of $9.6 million of a revolving line of credit with a financial institution and $13.8 million of non-recourse notes issued by CBC's subsidiaries. As of June 30, 2015, the debt approximated $46.7 million, consisting of a $14.4 million line of credit and an aggregate $32.3 million of non-recourse notes.

*Cash Flow*

As of June 30, 2015, our cash decreased $1.1 million to $27.6 million from $28.7 million at September 30, 2014.

Net cash used in operating activities was $4.7 million during the nine months ended June 30, 2015 compared cash provided by operations of $1.8 million during the nine months ended June 30, 2014 reflecting increased structured settlement activity. Net cash used in investing activities was $10.4 million during the nine month period ended June 30, 2015 compared to $3.0 million used in investing activity during the nine months ended June 30, 2014. The increase in cash used attributable to increased investment in structure settlement, and personal injury claims, in addition to the new investment in Topaz. The partially, offset by a decrease in consumer receivable collection. Net cash provided by financing activities was $14.1 million for the nine month period ended June 30, 2015, as compared to cash used in financing activities of $7.9 million in the nine month period ended June 30, 2014. This increase is primarily due to the financing activities of the CBC unit.

Our cash requirements have been and will continue to be significant and include external financing to operate various lines of business. Significant requirements include investment in personal injury claims, investment in structured settlements, costs involved in the collection of consumer receivables, repayment of CBC debt and investment in consumer receivable portfolios. In addition, dividends are paid if approved by the Board of Directors. Acquisitions recently have been financed through cash flows from operating activities. We believe we will be less dependent on a credit facility (with the exception of CBC) in the short-term as our cash flow from operations will be sufficient to purchase portfolios and finance the early stages of the disability advocacy business. However, as the collection environment remains challenging, we may seek additional financing.

We are cognizant of the current market fundamentals in the debt purchase and company acquisition markets which, because of significant supply and tight capital availability, could result in increased buying opportunities. We will continue to consider other financing options.

*Off Balance Sheet Arrangements*

As of June 30, 2015, we did not have any relationships with unconsolidated entities or financial partners, established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes. As such, we are not materially exposed to any financing, liquidity, market or credit risk that could arise if we had engaged in such relationships.

**Additional Supplementary Information:**

We do not anticipate collecting the majority of the purchased principal amounts. Accordingly, the difference between the carrying value of the portfolios and the gross receivables is not indicative of future revenues from these accounts acquired for liquidation. Since we purchased these accounts at significant discounts, we anticipate collecting only a portion of the face amounts.

For additional information regarding our methods of accounting for our investment in finance receivables, the qualitative and quantitative factors we use to determine estimated cash flows, and our performance expectations of our portfolios, see **"Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations — Critical Accounting Policies"** above.

**Collections Represented by Account Sales**

| Period | Collections Represented By Account Sales | Finance Income Earned |
|---|---|---|
| Nine Months ended June 30, 2015 | $ 79,000 | $77,000 |
| Three months ended June 30, 2015 | $ 76,000 | $76,000 |
| Nine Months ended June 30, 2014 | $ 2,000 | $ 2,000 |
| Three months ended June 30, 2014 | $ 1,000 | $ 1,000 |

**Recent Accounting Pronouncements**

In May 2014, the Financial Accounting Standards Board (the "FASB") issued an update to ASC 606, "Revenue from Contracts with Customers," that will supersede virtually all existing revenue guidance. Under this update, an entity is required to recognize revenue upon transfer of promised goods or services to customers, in an amount that reflects the entitled consideration received in exchange for those goods or services. The guidance also requires additional disclosure about the nature, amount, timing, and uncertainty of revenue and cash flows arising from the customer contracts. This update is effective for annual reporting periods beginning after December 15, 2016, including interim periods within that reporting period. Early application is not permitted. We are currently evaluating the impact this update will have on our consolidated financial statements as well as the expected adoption method.

In June 2014, the FASB issued ASU 2014-11, "Transfers and Servicing (Topic 860): Repurchase-to-Maturity Transactions, Repurchase Financings, and Disclosures." The amendments in this ASU require two accounting changes. First, the amendments in this ASU change the accounting for repurchase-to maturity transactions to secured borrowing accounting. Second, for repurchase financing arrangements, the amendments require separate accounting for a transfer of a financial asset executed contemporaneously with a repurchase agreement with the same counterparty, which will result in secured borrowing accounting for the repurchase agreement. This ASU also includes new disclosure requirements. The accounting changes in this Update are effective for public business entities for the first interim or annual period beginning after December 15, 2014. An entity is required to present changes in accounting for transactions outstanding on the effective date as a cumulative-effect adjustment to retained earnings as of the beginning of the period of adoption. Earlier application for a public business entity is prohibited. The Company reviewed this ASU and determined that it did not have a material impact on its consolidated financial statements.

In February 2015, the FASB issued ASU 2015-02, "Consolidation (Topic 810): Amendments to the Consolidation Analysis," which amends the consolidation requirements in ASC 810. This update is effective for public business entities for the first interim or annual period beginning after December 15, 2015. We are currently reviewing this ASU to determine if it will have an impact on our consolidated financial statements.

In May 2015, the FASB issued ASU 2015-07, "Fair Value Measurement (Topic 820): Disclosures for Investments in Certain Entities that Calculate Net Asset Value per Share (or Its Equivalent)". The amendments apply to reporting entities that elect to measure the fair value of an investment using the net asset value ("NAV") per share (or its equivalent) practical equivalent. The amendments remove the requirement to categorize within the fair value hierarchy all investments for which fair value is measured using the NAV per share practical expedient. The amendments in this ASU are effective for reporting periods beginning after December 15, 2015, with early adoption permitted. The Company has reviewed this ASU and elected to early adopt these amendments during the quarter ending December 31, 2014, and has removed certain investments that are measured using the NAV practical expedient from the fair value hierarchy in all periods presented in the Company's consolidated financial statements.

**Item 3.      Quantitative and Qualitative Disclosures about Market Risk**

We are exposed to various types of market risk in the normal course of business, including the impact of interest rate changes and changes in corporate tax rates. At June 30, 2015, the debt associated with our acquisition of CBC, had a balance of approximately $46.7 million, consisting of $14.4 million through a line of credit, at a rate of 4.1%, from a financial institution, and $32.3 million of notes at varying rates, from 5.39% to 8.75%, issued by CBC's subsidiaries. We do not currently invest in derivative financial or commodity instruments.

**Item 4.** **Controls and Procedures**

*a. Disclosure Controls and Procedures*

Based on criteria for effective internal control over financial reporting described in the standards promulgated by Public Company Accounting Oversight Board and in the Internal Control Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO 1992") Framework, we conducted an evaluation, under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of June 30, 2015. There are inherent limitations to the effectiveness of any system of disclosure controls and procedures, including the possibility of human error and the circumvention or overriding of the controls and procedures. Accordingly, even effective disclosure controls and procedures can only provide reasonable assurance of achieving their control objectives. Based on their evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of June 30, 2015.

The Company is in the process of implementing the criteria established in the Internal Control Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO 2013") and believes such new criteria would not materially affect the Company's evaluation described above that occurred during the third quarter of 2015.

*b. Changes in Internal Controls Over Financial Reporting*

In fiscal year 2014, Management identified a material weakness in our internal control over financial reporting related to the revenue recognition process in our consumer receivables portfolios, specifically related to the application of the interest method of accounting as promulgated by *Accounting Standards Codification ("ASC") 310-30, Receivables – Loans and Debt Securities Acquired with Deteriorated Quality* . During our review of portfolio cash flows, our controls did not include an analysis and review of the current cash flow variations within a quarter, to determine whether there is an impairment or accretion required. We took action to remediate the material weakness described above, which was completed during the 2015 fourth quarter. The action taken to remediate the material weakness is as follows:

• Implement the additional control of analyzing cash flows within a quarterly period, in addition to the already established life of the loan analysis, to determine whether there is an impairment of accretion adjustment required, when necessary.

• As our current inventory of portfolios are accounted for on the cost recovery method this control procedure was not applicable for the current quarter.

Except for the change discussed above, there have been no changes that occurred during the third quarter of 2015 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**PART II. OTHER INFORMATION**

**Item 1.** **Legal Proceedings**

In the ordinary course of our business, we are involved in numerous legal proceedings. We regularly initiate collection lawsuits, using our network of third party law firms, against consumers. Also, consumers occasionally initiate litigation against us, in which they allege that we have violated a federal or state law in the process of collecting their account. We do not believe that these ordinary course matters are material to our business and financial condition. As of the date of this Form 10-Q, we are not involved in any material litigation in which we are a defendant.

**Item 1A.**   **Risk factors**

      None

**Item 2.**   **Unregistered Sales of Equity Securities and Use of Proceeds**

      None

**Item 3.**   **Default Upon Senior Securities**

      None

**Item 4.**   **Mine Safety Disclosures**

      None

**Item 5.**   **Other Information**

      None

**Item 6.**   **Exhibits**

      (a) Exhibits.

| | |
|---|---|
| 31.1 | Certification of the Registrant's Chief Executive Officer, Gary Stern, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification of the Registrant's Chief Financial Officer, Robert J. Michel, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification of the Registrant's Chief Executive Officer, Gary Stern, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 | Certification of the Registrant's Chief Financial Officer, Robert J. Michel, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS | XBRL Instance |
| 101.SCH | XBRL Taxonomy Extension Schema |
| 101.CAL | XBRL Taxonomy Extension Calculation |
| 101.DEF | XBRL Taxonomy Extension Definition |
| 101.LAB | XBRL Taxonomy Extension Labels |
| 101.PRE | XBRL Taxonomy Extension Presentation |

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**ASTA FUNDING, INC.**
(Registrant)

| | | |
|---|---|---|
| Date: August 10, 2015 | By: | /s/ Gary Stern |
| | | Gary Stern, President, Chief Executive Officer |
| | | (Principal Executive Officer) |
| | | |
| Date: August 10, 2015 | By: | /s/ Robert J. Michel |
| | | Robert J. Michel, Chief Financial Officer |
| | | (Principal Financial Officer and Principal Accounting Officer) |

49

## EXHIBIT INDEX

| Exhibit Number | Description |
| --- | --- |
| 31.1 | Certification of the Registrant's Chief Executive Officer, Gary Stern, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification of the Registrant's Chief Financial Officer, Robert J. Michel, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification of the Registrant's Chief Executive Officer, Gary Stern, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 | Certification of the Registrant's Chief Financial Officer, Robert J. Michel, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS | XBRL Instance |
| 101.SCH | XBRL Taxonomy Extension Schema |
| 101.CAL | XBRL Taxonomy Extension Calculation |
| 101.DEF | XBRL Taxonomy Extension Definition |
| 101.LAB | XBRL Taxonomy Extension Labels |
| 101.PRE | XBRL Taxonomy Extension Presentation |

**Exhibit 31.1**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER PURSUANT TO SECTION 302 OF THE SARBANES- OXLEY ACT OF 2002**

I, Gary Stern, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Asta Funding, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d — 15(f) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: August 10, 2015

/s/ Gary Stern
Chairman, President and Chief Executive Officer
(Principal Executive Officer)

**Exhibit 31.2**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Robert J. Michel, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Asta Funding, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: August 10, 2015

/s/ Robert J. Michel
Robert J. Michel
Chief Financial Officer, Secretary and
Chief Accounting Officer

Exhibit 32.1

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Asta Funding, Inc. (the "Company") on Form 10-Q for the quarter ended June 30, 2015, filed with the Securities and Exchange Commission (the "Report"), I, Gary Stern, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)    The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the consolidated financial condition of the Company as of the dates presented and the consolidated result of operations of the Company for the periods presented.

Dated: August 10, 2015

/s/ Gary Stern
_____
Gary Stern
Chairman, President and Chief Executive Officer
(Principal Executive Officer)

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Asta Funding, Inc. (the "Company") on Form 10-Q for the quarter ended June 30, 2015, filed with the Securities and Exchange Commission (the "Report"), I, Robert J. Michel, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)    The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the consolidated financial condition of the Company as of the dates presented and the consolidated result of operations of the Company for the periods presented.

Dated: August 10, 2015

/s/ Robert J. Michel
Robert J. Michel
Chief Financial Officer, Secretary and
Chief Accounting Officer